# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### April 18, 2018 Session

## CINDY HATFIELD, ET AL. v. ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-004249-10      Donna M. Fields, Judge**

———————————————————————

### No. W2017-00957-COA-R3-CV

———————————————————————

This appeal results from a jury trial on claims of negligence, medical malpractice, and violations of the Tennessee Adult Protection Act by a nursing home. In addition to finding the limited liability company nursing home liable for the resident's injuries, the jury awarded extensive compensatory and punitive damages against the nursing home's related administrative services provider, the nursing home's parent companies, and the individual members of the parent companies. Defendants appeal, raising a variety of issues related to the jury impaneled, the evidence presented, and the finding of liability against the non-nursing home defendants. We reverse the jury's decision finding material evidence to subject the nursing home's parent companies and their members directly or vicariously liable in this case. We affirm the direct liability of the nursing home's administrative services provider. Because the amount of punitive damages awarded by the jury appears to be largely predicated on the liability of the non-nursing home defendants, we vacate the award and remand for a new hearing solely as to the amount of punitive damages to be awarded. In all other respects, the verdict is affirmed. Affirmed in part, reversed in part, vacated in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

Leo Bearman, Craig Conley, and Kristine L. Roberts, Memphis, Tennessee; and A. La'verne Edney, Jackson, Mississippi, for the appellants, Allenbrooke Nursing and Rehabilitation Center, LLC, d/b/a Allenbrooke Nursing and Rehabilitation Center; Aurora Cares, LLC; DTD HC, LLC; D&N, LLC; Donald Denz, Individually and as the Sole Member of DTD HC, LLC, and Chief Executive Officer and Chief Financial Officer

of Aurora Cares, LLC; and Norbert Bennett. Individually, and as the Sole Member of D&N, LLC and Chief Executive Officer of Aurora Cares, LLC.

Cameron C. Jehl, Carey L. Acerra, Deena K. Arnold, Memphis, Tennessee; Kenneth L Connor, Aiken, South Carolina; and Stephen Trzcinski, Philadelphia, Pennsylvania, for the appellee, Cindy Hatfield, as Administratrix of Estate of Martha Jane Pierce, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Martha Jane Pierce.

## OPINION

## Background

This case involves the treatment and care of a patient, Martha Jane Pierce, while in the care of Allenbrooke Nursing Home, LLC ("Allenbrooke" or "the facility"). When Mrs. Pierce arrived at the facility, she had been diagnosed with several existing ailments, such as high blood pressure, dementia, coronary artery disease, and had undergone a bypass surgery. In May 2009, Mrs. Pierce suffered a stroke, which rendered her largely immobile and reliant on substantial care at the facility. In June 2009, a pressure wound was discovered on Mrs. Pierce's foot.[1] Ultimately, the wound became severely infected, and Mrs. Pierce's leg was amputated above the knee on August 7, 2009. Following the operation, Mrs. Pierce returned to the facility. Mrs. Pierce died on October 11, 2009.[2]

On August 26, 2010, Cindy Hatfield, as Administratrix of Mrs. Pierce's estate and on behalf of her wrongful death beneficiaries (in her administrative capacity, "Plaintiff") filed a complaint against Allenbrooke, Aurora Cares, LLC ("Aurora Cares"), a limited liability company that provided administrative services to Allenbrooke, DTD HC, LLC ("DTD") and D&N, LLC ("D&N"), the limited liability companies that own Allenbrooke, and the members of DTD and D&N, Norbert Bennett and Donald Denz ("the individual defendants," with Aurora Cares, DTD, and D&N, "the non-Allenbrooke Defendants," and all together with Allenbrooke, "Defendants"). The non-Allenbrooke Defendant companies are based in New York and the individual defendants are residents of New York. The complaint alleged that Allenbrooke and the other defendants were all liable for negligence, medical malpractice, breach of contract, violations of the Tennessee Adult Protection Act ("TAPA"), and wrongful death.[3] The complaint sought both compensatory and punitive damages against all Defendants.

---

[1] These types of injuries are referred to variously as pressure sores and pressure ulcers. *See Mosby's Dictionary of Medicine, Nursing & Health Professions* 1450 (9th ed. 2013) (defining a pressure ulcer as synonymous with "bedsore, . . . pressure necrosis, pressure sore").

[2] Mrs. Pierce's husband also resided at the facility and continued to do so after her death. There are no allegations in this case concerning negligence toward Mr. Pierce.

[3] In 2012, the Tennessee Generally Assembly enacted a law that changed all codifications referring to "medical malpractice" to "health care liability." *See* 2011 Tennessee Laws Pub. Ch. 510 (H.B. 2008), eff. Oct. 1, 2011. Because this action was instituted in August 2010, we continue to use the

The parties litigated several motions in limine; some motions were resolved prior to trial, while the trial court took some motions under advisement pending trial. The trial court also denied several motions to dismiss the non-Allenbrooke Defendants, both on jurisdictional grounds and because the non-Allenbrooke Defendants were allegedly not involved in Mrs. Pierce's care.

A five week jury trial began in July 2016. During juror selection two allegedly improper jurors were placed on the jury despite for cause challenges by Defendants: (1) a juror who stated that he had negative feelings toward nursing homes but could be fair; and (2) a juror that the trial court described as having "special needs" who later told the trial court he was off his "meds" and needed to see his psychiatrist.

Ms. Hatfield, Mrs. Pierce's daughter, testified that Mrs. Pierce lost mobility following a May 2009 stroke. As such, she required considerable care in repositioning and bathing. According to Ms. Hatfield, she was often concerned about the lack of care given to her mother at Allenbrooke and staff at Allenbrooke never informed her of the severity of Mrs. Pierce's wound until Mrs. Pierce's son discovered it in August 2009. Allenbrooke staff documented the wound, however, as early as June 29, 2009. By August 2009, the wound had become so infected that Ms. Hatfield testified that it smelled like "death." Because Mrs. Pierce's flesh had necrotized, amputation above the knee was required. According to Plaintiff's witnesses, Allenbrooke's records showed that Mrs. Pierce did not receive proper care following the discovery of the wound, as consultations with wound specialists and dieticians were improperly delayed, the recommendations from these specialists were not timely or properly implemented, and Mrs. Pierce was not properly receiving prescribed pain medications.

During trial, Plaintiff presented testimony from several former Allenbrooke employees, including four certified nursing assistants ("CNAs"), one licensed practical nurse ("LPN"), and one former staff development coordinator. These witnesses testified as to their recollections of Mrs. Pierce, as well as general conditions in the nursing home.[4] Generally, these witnesses testified that because of understaffing at Allenbrooke, residents were often not properly turned or found sitting in their own urine or feces, including Mrs. Pierce. According to the testimony and Allenbrooke's own training videos, these conditions "can burn the skin making it five times more likely to get a pressure ulcer." At times, the CNAs testified that the residents had been sitting in that condition for quite some time, as evidenced by the fact that the bodily fluids had dried to brown rings on the residents' bedding. The witnesses also testified that Allenbrooke was made aware of the understaffing but made efforts to conceal the understaffing during state surveys; the witnesses admitted, however, that the surveys were random and no notice was provided of the dates of the surveys.

---

terminology applicable at that time.

[4] Some of the witnesses had no recollection of Mrs. Pierce, particularly staffing coordinator Tonette Rogers.

The trial court permitted Plaintiff to ask leading questions of these witnesses on the ground that they were former Allenbrooke employees and also refused to allow Defendants to delve into any bias the witnesses may have had related to whether they were terminated from Allenbrooke. Ms. Hatfield also testified that another doctor who was not involved in the litigation had informed her that she definitely had a lawsuit. In addition, despite an earlier motion in limine, Plaintiff's "summary" expert, Victoria Fierro, was also allegedly allowed to testify to matters other than what had been previously ordered by the trial court. According to Defendants, Ms. Fierro was unqualified to testify as to these issues. Ms. Fierro generally testified that according to Allenbrooke's records, it saved money by not properly staffing its facility to meet resident needs. In contrast, Defendants called their own expert to rebut Ms. Fierro's calculations.

Mr. Denz and Mr. Bennett were also called to discuss their role in Allenbrooke. Mr. Denz and Mr. Bennett admitted that DTD and D&N had no real operations outside of ownership interests in other limited liability companies. Both Mr. Denz and Mr. Bennett insisted, however, they were not involved in the day-to-day operations of either Allenbrooke or Aurora Cares. Mr. Denz and Mr. Bennet maintained that DTD and D&N likewise had no involvement in the operations of Allenbrooke or Aurora Cares. Corporate documents were admitted, however, that showed that the individual defendants had granted themselves "complete, full, exclusive discretion, power, and authority" in the management of Allenbrooke and their respective holding companies. Mr. Denz and Mr. Bennett contended, however, that they never exercised this power. With regard to Allenbrooke specifically, they asserted that Tennessee law requires that the operational power be vested in a licensed administrator. *See* Tenn. Comp. R. & Regs. 1200-08-06-.04(a). Although Mr. Denz and Mr. Bennett admitted that they were on the governing board of Allenbrooke, they asserted that they never exercised any control over staffing or care issues at Allenbrooke, as those decisions were left to the administrator's discretion. Allenbrooke licensed administrator Bobby Meadows and Aurora Cares President Chance Becnel confirmed that neither Mr. Denz nor Mr. Bennett ever interfered in staffing or care decisions at Allenbrooke. Mr. Denz and Mr. Bennett did admit that, in connection with their interest in Allenbrooke, they had created and recommended a bonus structure for Allenbrooke's administrator and other managing personnel that would award a bonus based in part on budgetary issues. According to Administrator Meadows, however, the bonus was merely a "recommendation."

Plaintiff also presented two medical experts: (1) a nurse practitioner who opined that the nursing care provided in this case fell well below the standard of care; and (2) Dr. Todd Robbins, who opined that Mrs. Pierce's injuries were the result of a "total neglect" of care by Allenbrooke.

Following the denial of a motion for directed verdict, Defendants called a nurse practitioner as an expert to testify that Allenbrooke's care did not fall below the standard of care; Plaintiff attacked the expert's credibility on the basis that she had previously

worked as an actress. Defendants also called a physician, who opined that Mrs. Pierce's injuries were not the result of Defendants' negligence, but caused by other factors such as loss of circulation in her legs. Current Allenbrooke employees and Defendants' expert witness testified that Allenbrooke was not understaffed and that Allenbrooke met all state and federal requirements with regard to staffing. Defendants also called witnesses to show that none of the non-Allenbrooke Defendants had any role in the day-to-day operation of the nursing home or any of its medical or staffing decisions. Defendants renewed their motion for a directed verdict at the close of the proof, but the motion was again denied.

The parties engaged in extensive argument as to the jury verdict form and the jury instructions; they eventually agreed to a twenty-page jury form involving claims of medical negligence, general negligence, TAPA, and punitive damages. The jury form did not specifically discuss comparative fault. After the jury was asked to find the Defendants liable on the three claims alleged, the special verdict form then asked the jury to determine if the Defendants were agents, joint ventures, or alter egos of each other. If the jury found one or more of these theories to be supported by the proof, the jury verdict form stated that the jury need not apportion fault among the parties. The jury ultimately awarded a verdict against all of the Defendants for negligence in the amount of $1,906,000.00 and for TAPA violations in the amount of $129,000.00.[5] The jury also found that the Defendants were jointly and severally liable under the theories of agency, joint venture, and alter ego. Although the jury found all of the Defendants liable for medical malpractice, it assessed no separate damages for this tort. The jury did not find Defendants liable for Mrs. Pierce's death. The jury did find, however, that Defendants' conduct was sufficient to warrant the imposition of punitive damages.

A trial was thereafter held to determine the amount of punitive damages to be awarded. The jury ultimately awarded $28,000,000.00 in punitive damages: $2,000,000.00 each against Allenbrooke, Aurora Cares, DTD, and D&N; and $10,000,000.00 against each of the individual defendants. The trial court asked each party to submit proposed findings of fact and conclusions of law on the punitive damages issue; according to Defendants, the trial court adopted Plaintiff's proposed order largely verbatim although it did not track the trial court's oral ruling. The trial court later denied all post-trial motions, including a motion for judgment notwithstanding the verdict or in the alternative for a new trial ("motion for new trial")[6] and a motion requesting remittitur. From this judgment, Defendants appeal.

---

[5] The jury form included questions regarding the liability of the non-Allenbrooke Defendants on the basis of direct liability, agency, joint venture, and alter ego. The jury found liability under all theories.

[6] We are cognizant that motions for new trial and motions for judgment notwithstanding the verdict, aka motions for judgment in accordance with a motion for directed verdict, have separate purposes. *See generally* ***Cortez v. Alutech***, ***Inc.***, 941 S.W.2d 891, 893 (Tenn. Ct. App. 1996) (discussing the differences in these motions). We refer to Defendants' motion simply as a motion for new trial for ease of reading.

**Issues Presented**

Defendants collectively raise the following issues, which are taken from their brief and slightly restated:

1. Whether the trial court erred in refusing to strike biased and/or incompetent jurors from the jury.

2. Whether the trial court erred in allowing irrelevant and highly prejudicial testimony to be introduced by Plaintiff from former employees of Allenbrooke and then refusing to allow Defendants to cross-examine those former employees as to their bias.

3. Whether the trial court erred in allowing improper cross-examination of one of Defendants' expert witnesses in violation of Rule 608 of the Tennessee Rules of Evidence.

4. Whether the trial court erred in refusing to grant a mistrial when Plaintiff's counsel elicited hearsay testimony from Ms. Hatfield that a physician told her she "[d]efinitely" had a lawsuit, particularly after Defendants had filed a motion in limine to prohibit such testimony.

5. Whether the trial court erred in allowing improper and prejudicial opinion testimony from Plaintiff's summary witness, Victoria Fierro, in violation of Plaintiff's representation that Ms. Fierro would not testify to opinions, in violation of the trial court's own order that Ms. Fierro would not be allowed to testify to opinions, and in violation of Rule 1006 of the Tennessee Rules of Evidence.

6. Whether the trial court erred in allowing Ms. Fierro to give opinion evidence because she was unqualified to do so.

7. Whether the trial court erred in approving the jury verdicts, which, as evidenced by the special jury verdict form, were inconsistent and illogical, and which improperly apportioned fault jointly and severally against all Defendants in disregard of Tennessee law.

8. Whether the trial court erred in approving a transparently excessive compensatory damage verdict.

9. Whether the trial court erred in upholding the jury's finding of punitive damage liability against Defendants.

10. Whether the trial court erred in approving an unconstitutional and clearly excessive punitive damage award.

11. Whether the trial court erred in adopting Plaintiff's version of findings of fact and conclusions of law with regard to punitive damages in violation of the requirements delineated in *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303 (Tenn. 2014).

12. Whether the trial court's punitive damage review pursuant to *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992), was factually inadequate and legally erroneous, as it was based on direct contradictions of

the evidence, including a nonexistent finding by the jury that Defendants were responsible for the death of Plaintiff's decedent.

13.     Whether the trial court erred in its **_Hodges_** review by applying the wrong standard of review to the punitive damages verdict and the amount of punitive damages awarded.

14.     Whether the trial court erred in failing to grant a remittitur as to both the compensatory and punitive damage awards.

15.     Whether the trial court erred in failing to order a new trial in the interests of justice.

The non-Allenbrooke Defendants also raise a number of issues that are particular only to them:

1.     Whether the trial court erred in failing to dismiss out-of-state defendants Mr. Denz, Mr. Bennett, DTD, and D&N for lack of personal jurisdiction.

2.     Whether the trial court erred in considering Mr. Denz, Mr. Bennett, DTD, D&N, Aurora Cares, and Allenbrooke as alter egos by allowing the jury to pierce the corporate veil and by disregarding the separateness of each corporate entity Defendant and each individual Defendant.

3.     Whether the trial court erred in failing to grant a directed verdict in favor of Mr. Denz, Mr. Bennett, DTD, D&N, and Aurora Cares at the conclusion of Plaintiff's proof.

4.     Whether the trial court erred in allowing Plaintiff's causes of action for alleged medical malpractice and violation of TAPA to be submitted to the jury against Mr. Denz, Mr. Bennett, DTD, D&N, and Aurora Cares.

**Analysis**

### I.     Personal Jurisdiction

We begin with the question of whether the trial court possessed personal jurisdiction over the individual defendants, Mr. Denz and Mr. Bennett, as well as DTD and D&N. "A decision regarding the exercise of personal jurisdiction over a defendant involves a question of law." **_Gordon v. Greenview Hosp., Inc._**, 300 S.W.3d 635, 645 (Tenn. 2009). As such, the decision is reviewed de novo with no presumption of correctness. **_Id._** (citing **_Woodruff v. Anastasia Int'l, Inc._**, No. E2007-00874-COA-R3-CV, 2007 WL 4439677, at *3 (Tenn. Ct. App. Dec.19, 2007) *perm. app. withdrawn* (Tenn. Apr. 7, 2008)).

A brief recitation of the procedural history with regard to this issue is helpful. Here, the individual defendants, DTD, and D&N filed a motion to dismiss on October 11, 2010, arguing that the trial court lacked personal jurisdiction over them for purposes of

this case. The motions languished for some time and the parties proceeded to discovery. On October 27, 2014, new counsel appeared for the individual defendants, DTD, and D&N. Then, on November 7, 2014, the individual defendants, DTD, and D&N filed a new motion to dismiss, or in the alternative, for summary judgment; the motion raised several bases for dismissal, but did not specifically address personal jurisdiction.

On May 19, 2015, Plaintiff filed a motion for default judgment against the individual defendants, DTD, and D&N. Therein, Plaintiff noted that while these parties had filed a motion to dismiss based on personal jurisdiction years earlier, they had not scheduled their motion for hearing, nor had they filed an answer. The individual defendants, DTD, and D&N responded in opposition, noting that they had filed a motion to dismiss, had fully participated in the case, and were vigorously defending their rights. The individual defendants, DTD, and D&N filed an answer on the same day, raising as an affirmative defense lack of personal jurisdiction. On July 2, 2015, the individual defendants, DTD, and D&N filed a supplement to their motion to dismiss. On July 10, 2015, Plaintiff responded in opposition to the motion to dismiss.

Although the trial court had orally ruled that it maintained personal jurisdiction over the individual defendants, DTD, and D&N, the trial court did not enter an order denying any pending motions to dismiss until August 3, 2015. The order incorporated the trial court's oral ruling, wherein it found that the individual defendants had exerted enough control over Allenbrooke to subject them to jurisdiction in Tennessee. The trial court noted, however, that it wanted to "continue to read" and consider the jurisdictional issue.

Apparently in response to the trial court's oral ruling, the individual defendants, DTD, and D&N filed a motion to alter or amend the denial of the motion to dismiss for lack of personal jurisdiction on July 24, 2015. The trial court denied the motion by order of May 10, 2016. Therein, the trial court denied the motion on two bases: (1) that the individual defendants, DTD, and D&N had sufficient contacts with Tennessee to be subject to personal jurisdiction here; and (2) that the individual defendants, DTD, and D&N "waived the defense of lack of personal jurisdiction and submitted to the Court's jurisdiction when [they] sought affirmative relief from the Court in the form of [several listed motions and orders]."

On appeal, the individual defendants, DTD, and D&N argue that the trial court erred in finding that it possessed personal jurisdiction over them. Rather than arguing that the trial court properly exercised personal jurisdiction over the individual defendants, DTD, and D&N, Plaintiff asserts that this issue has been waived because the individual defendants, DTD, and D&N did not address the second basis of the trial court's May 10, 2016 order—waiver. We agree.

Here, the trial court entered two written orders on the issue of personal jurisdiction. First, on August 3, 2015, the trial court denied the motion to dismiss for lack of personal jurisdiction on the ground that the facts showed sufficient contacts with Tennessee to subject the individual defendants to jurisdiction here. The trial court, however, essentially invited further litigation with its oral ruling, noting that further research could be done on the issue. The individual defendants, DTD, and D&N accepted the trial court's invitation and filed a motion to alter or amend the trial court's ruling. As noted by the individual defendants, DTD, and D&N in their reply brief, because this case was non-final at the time of the August 3, 2015 order, the trial court's denial of the motion to dismiss was interlocutory in nature and subject to revision at any time prior to the entry of a final order. *See Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983) (noting that an interlocutory order "can be revised at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all parties"); *Winter v. Smith*, 914 S.W.2d 527, 535 (Tenn. Ct. App. 1995) (stating that an interlocutory order is "subject to revision by the trial court any time prior to the entry of a final judgment adjudicating all the claims raised"). As such, Rule 54.02 of the Tennessee Rules of Civil Procedure provides a mechanism for revision of non-final orders:

> When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the Court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

Thus, the August 3, 2015 order was not the final order with regard to the jurisdictional issue in this case. Instead, the individual defendants, DTD, and D&N exercised their right under Rule 54.02 to seek revision of that order, which resulted in the trial court's May 10, 2016 order. The trial court's May 2016 order does not specifically reserve any issues with regard to personal jurisdiction for final review. Moreover, the individual defendants, DTD, and D&N cite no later written orders in which the trial court ruled on the jurisdictional argument or specifically altered its May 10, 2016 ruling prior to final judgment in this case.[7] The May 10, 2016 order was therefore the final written

---

[7] The individual defendants, DTD, and D&N argue that the trial court's oral rulings should also be considered as separate instances in which the trial court issued a ruling on the jurisdictional issue, none of which address waiver. It is well-settled, however, that the courts speak through their orders. *See Ladd*

order in place on this issue at the time of the final judgment. Consequently, this order is the operative order for purposes of this appeal. *Cf., Hannah v. Beyer*, No. 02A01-9110-CH-00217, 1994 WL 37749, at *2 (Tenn. Ct. App. Feb. 7, 1994) ("[W]hen a final judgment is entered all of the interlocutory orders become final.").

The trial court's May 10, 2016 order clearly contains two bases for denying the motion to dismiss: (1) that minimum contacts had been found to support exercising personal jurisdiction; and (2) that the individual defendants, DTD, and D&N waived the defense of lack of personal jurisdiction. Generally, where a trial court provides more than one basis for its ruling, the appellant must appeal all the alternative grounds for the ruling. *See* 5 Am. Jur. 2d *Appellate Review* § 718 ("[W]here a separate and independent ground from the one appealed supports the judgment made below, and is not challenged on appeal, the appellate court must affirm."); *see also Tower Oaks Blvd., LLC v. Procida*, 219 Md. App. 376, 392, 100 A.3d 1255, 1265 (Md. 2014) ("The law of appellate review establishes that, "'[w]hen a separate and independent ground that supports a judgment is not challenged on appeal, the appellate court must affirm.'") (citation omitted); *Prater v. State Farm Lloyds*, 217 S.W.3d 739, 740–41 (Tex. App. 2007) ("When a separate and independent ground that supports a ruling is not challenged on appeal, we must affirm the lower court's ruling."); *Johnson v. Commonwealth of Virginia*, 45 Va. App. 113, 116, 609 S.E.2d 58, 60 (Va. 2005) ("[W]e join the majority of jurisdictions holding that in 'situations in which there is one or more alternative holdings on an issue,' the appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.'") (citation omitted).

Tennessee recognized and applied this doctrine in *Duckworth Pathology Grp., Inc. v. Reg'l Med. Ctr. at Memphis*, No. W2012-02607-COA-R3-CV, 2014 WL 1514602 (Tenn. Ct. App. Apr. 17, 2014). In *Duckworth*, the trial court entered an order dismissing the plaintiff's complaint crediting several alternative grounds of dismissal. *Id.* at *11. The plaintiff-appellant only raised one ground for dismissal on appeal, failing even to mention the alternative grounds in its appellate brief. *Id.* The defendant-appellee pointed out the plaintiff-appellant's failure in its response brief and argued that the issues were therefore waived. *Id.* The plaintiff-appellant thereafter attempted to argue the alternative grounds in its reply brief. *Id.* This Court, however, refused to entertain the plaintiff-appellant's arguments that were raised for the first time in its reply brief, noting that a reply brief was not the vehicle for raising new issues. *Id.* ("[W]e will not consider [the plaintiff-appellant's] belated attempt to challenge the propriety of the trial court's alternative rulings."). Thus, we affirmed the judgment of the trial court on the basis of waiver. *Id.* ("Because [the plaintiff-appellant's] failed to appeal all of the alternative

---

*v. Honda Motor Co*., 939 S.W.2d 83, 104 (Tenn.Ct.App.1996) ("A court speaks only through its written orders."). We therefore do not consider these rulings separate from the written orders that memorialize them.

grounds for dismissal in the trial court's order, the [defendant-appellee's] argument that we need not consider the two issues *Duckworth* presented on appeal is well-taken.").

Here, the trial court's final written order on the jurisdictional issue, the May 10, 2016 order, clearly provides that one basis for the ruling is waiver. Waiver is applicable to the defense of lack of personal jurisdiction and may result in a defendant being unable to challenge personal jurisdiction. *See generally Woodruff*, 2007 WL 4439677, at *3 (quoting *Brokerwood Prods. Int'l, Inc. v. Cuisine Crotone, Inc.*, 104 Fed. App'x 376, 379-80 (5th Cir. 2004)) (holding that lack of personal jurisdiction may be waived "by failing to pursue the defense"). As such, it constitutes an alternative and independent basis for denying a motion to dismiss for lack of personal jurisdiction. *See Johnson* 609 S.E.2d at 60 (noting that we must determine whether a trial court's ruling is indeed an alternative holding, i.e., "one that (when properly applied to the facts of a given case) would legally constitute a freestanding basis in support of the trial court's decision").

There can be no dispute that the individual defendants, DTD, and D&N were aware of the trial court's ruling on waiver, as the issue of waiver was raised during the hearing on the motion for new trial.[8] Despite this clear notice, waiver is not mentioned or argued in the initial brief filed on behalf of the individual defendants, DTD, and D&N. Rather, the individual defendants, DTD, and D&N only argue that the trial court erred in finding a basis to exercise personal jurisdiction over them. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010). Here, although the substantive merits of the lack of personal jurisdiction defense were fully argued in the initial brief, the initial brief filed by the individual defendants, DTD, and D&N simply contains no argument whatsoever concerning whether the defense was waived due to participation in the case, as clearly found by the trial court.

After the omission of this argument in the initial brief was noted by Plaintiff in her response brief, however, the individual defendants, DTD, and D&N attempted to challenge the trial court's finding of waiver of their personal jurisdiction defense in their reply brief. It is well-settled, however, that appellants may not raise new issues in their reply briefs or use reply briefs to correct deficiencies in initial briefs. *See, e.g., Adler v. Double Eagle Properties Holdings, LLC*, No. W2014-01080-COA-R3-CV, 2015 WL 1543260, at *6 (Tenn. Ct. App. Apr. 2, 2015) (ruling that a reply brief could not correct the errors in an initial brief); *Denver Area Meat Cutters & Emp'rs Pension Plan v.*

---

[8] Despite this argument, we note that Defendants fail to point out anything in the trial court's order denying Defendant's request for a new trial that specifically alters its prior decision with regard to the jurisdictional issue. Instead, it appears that the trial court did not specifically address jurisdiction in denying the motion for new trial. The holding of the May 10, 2016 order was therefore not altered.

*Clayton*, 209 S.W.3d 584, 594 (Tenn. Ct. App. 2006) (refusing to consider an argument raised for the first time in a reply brief). Thus, like the plaintiff-appellant in *Duckworth*, the individual defendants, DTD, and D&N waived any challenge to the trial court's waiver ruling by failing to address this argument in any fashion in their initial brief. *Duckworth*, 2014 WL 1514602, at \*11. Because the individual defendants, DTD, and D&N failed to challenge one of the alternative grounds for denying the motion to dismiss for lack of personal jurisdiction, the trial court's decision must be affirmed.[9] *Id.*; *see also* 5 Am. Jur. 2d *Appellate Review* § 718.

## II.     Jury Issues

Defendants next assert that the trial court erred in failing to disqualify two jurors. In Tennessee, the parties in a civil case have the right to have the factual issues in their lawsuit determined by a fair and unbiased jury. *See* Tenn. Const. Art. I, § 6. State law provides expressly that cause to disqualify a juror exists if "a state of mind exists on the juror's part that will prevent the juror from acting impartially. . . ." Tenn. Code Ann. § 22-1-105. Where such cause exists, "a court may discharge" the juror from service. *Id.*

As explained by this Court,

> The trial judge has "wide discretion in passing upon the qualification of jurors in both civil and criminal cases." *Vines v. State*, 190 Tenn. 644, 648, 231 S.W.2d 332, 334 (1950). Absent a clear showing of abuse of discretion, the trial judge's determination of the jurors' qualifications is not subject to review. *Lindsey v. State*, 189 Tenn. 355, 367, 225 S.W.2d 533, 538 (1949).
>
> The ultimate goal of voir dire is to determine whether the jurors are competent, unbiased, and impartial. The scope and extent of voir dire rests within the discretion of the trial court. *State v. Harris*, 839 S.W.2d 54, 65 (Tenn.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Even if the court errs by excluding a juror for cause, the error is harmless unless the jury who ultimately hears the case is not fair and

---

[9] The individual defendants, DTD, and D&N assert that if this court were to conclude that they failed to address the waiver issue as required in their initial brief, this Court could exercise its discretion to consider the issue notwithstanding the omission. Under Rule 13(b) of the Tennessee Rules of Civil Procedure, this Court may address issues that were not properly presented for review in certain limited circumstances, including to prevent needless litigation, to prevent injuries to the public, and to prevent prejudice to the judicial process. *See also* Tenn. R. App. P. 2 (allowing this Court to suspend its rules "for good cause"). Here, the parties were permitted additional pages in their briefs to address their arguments to this Court; Defendants chose to argue a total of nineteen issues. Of those issues, however, Defendants' initial briefs contain no argument relevant to the waiver issue, despite clear notice that it formed one basis for the trial court's decision. Under these circumstances, we decline to exercise our discretion to allow Defendants to argue an improperly raised issue.

impartial. ***State v. Simon***, 635 S.W.2d 498, 508–11 (Tenn.), *cert. denied*, 459 U.S. 1055, 103 S. Ct. 473, 74 L.Ed.2d 621 (1982).

> "It is axiomatic that a party is entitled to a jury composed of persons free from bias or prejudice." ***Carney v. Coca–Cola Bottling Works***, 856 S.W.2d 147, 149 (Tenn.1993). "'The right to challenge is a right to reject, not to select a jury.'" ***Estep v. State***, 193 Tenn. 222, 226, 245 S.W.2d 623, 625 (1951) (quoting ***Wooten v. State***, 99 Tenn. 189, 199, 41 S.W. 813, 815 (1897)). Parties to a law suit have a right to an impartial jury, but they have no vested right to any particular juror. ***Graham v. United States***, 257 F.2d 724, 729 (6th Cir. 1958). The trial judge has the power and it is his duty to discharge any juror who, for any reason, cannot or will not be an unbiased juror. ***Walden v. State***, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976). A juror must be free of even a reasonable suspicion of bias or prejudice to meet the requirement of impartiality. ***State v. Pender***, 687 S.W.2d 714, 718 (Tenn. Crim. App. 1984).

***Danmole v. Wright***, 933 S.W.2d 484, 487 (Tenn. Ct. App. 1996).

Here, Defendants contend that two jurors were wrongly seated on the jury in this case: (1) Juror Marshall, who expressed a bias against nursing homes; and (2) Juror Council, who Defendants describe as having an "obvious mental disability" and who, following the trial, posted a comment on social media noting that he had "prayed" that the Plaintiffs would prevail. Based on the fact that these two jurors were allowed to serve, Defendants assert that a new trial is warranted.

In response, Plaintiff argues that this issue has been waived by Defendants where they failed to use remaining peremptory challenges to challenge these jurors.

> It is a long-settled principle that a defendant who disagrees with a trial court's ruling on for cause challenges must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise peremptory challenges to remove the jurors. Even then, however, the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him.

***State v. Howell***, 868 S.W.2d 238, 248 (Tenn. 1993) (citing ***Ross v. Oklahoma***, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988)).

Here, at the time that Juror Council was initially seated on the jury, there can be no dispute that Defendants had a remaining peremptory challenge to utilize to strike jurors. Defendants, however, chose not to utilize that challenge at that time. After Juror Council was impaneled on the jury, another juror was excused from the jury due to a work-related issue, and juror selection commenced once again. During this second phase of jury

- 13 -

selection, questions arose regarding Juror Council's mental competence.[10] At this later time, however, it still appears that Defendants had a remaining peremptory challenge, which Defendants appear to have been saving for another juror that was to be called next. As such, during the jury selection process, Defendants clearly waived any objection to Juror Council by failing to utilize their remaining peremptory challenge. *See Howell*, 868 S.W.2d at 248.

The same is not true of Juror Marshall. Juror Marshall was called after another juror was excused for work-related reasons. At the time this juror was excused, however, Defendants had one remaining peremptory challenge. The first juror to be called was Juror Knox. Defendants exercised a peremptory challenge against Juror Knox, which then resulted in the next juror being Juror Marshall. At that time, Defendants had no remaining peremptory challenges and sought to challenge Juror Marshall for cause. Thus, they did not waive their challenge to Juror Marshall.

Still, we cannot conclude that the trial court erred in failing to excuse Juror Marshall. It is true that Juror Marshall indicated during voir dire that he had a preconceived negative perception of nursing homes due to television advertisements. Juror Marshall, however, somewhat conversely agreed that these feelings would "cause [him] to be more in favor of the defendant than the plaintiff in this case." Regardless, when asked whether he could set those feelings aside, Juror Marshall unequivocally indicated that he could, even going so far as to agree to "promise" to be "fair and impartial to both sides." Although a trial court may exercise its discretion to "dismiss a juror for cause even if the juror maintains that he or she will be able to set aside the circumstance raising a question as to the juror's impartiality[,]" *McDonald v. Shea*, No. W2010-02317-COA-R3-CV, 2012 WL 504510, at *20 (Tenn. Ct. App. Feb. 16, 2012), the Tennessee Supreme Court has held that a trial court does not abuse its discretion in declining to dismiss a juror with preconceived notions concerning some issues at trial when the juror states that he can be impartial. *See State v. Bates*, 804 S.W.2d 868, 877–88 (Tenn. 1991).

In *Bates*, the defendant argued that the trial court erred in not granting for cause challenges to jurors who expressed pre-conceived notions regarding the death penalty. *Id.* at 877. The Tennessee Supreme Court opined, however, that, the jurors were proper where each juror "made it clear that he or she would follow the law and consider all of the evidence and the factors relevant to sentencing before reaching a decision." *Id.* (quoting *Murphy v. Fla.*, 421 U.S. 794, 800, 95 S. Ct. 2031, 2036, 44 L. Ed. 2d 589 (1975) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.")). Here, Juror Marshall unequivocally

---

[10] From our review, at this time, a good deal of the concern regarding Juror Council's mental competence resulted from speculation and extra-judicial assumptions based on the nature of Juror Council's employment.

- 14 -

stated that he could set aside his preconceived feelings to impartially judge the evidence presented. After recalling Juror Marshall's responses regarding his impartiality, the trial court judge ruled that she was satisfied that Juror Marshall could be fair. Given that Juror Marshall clearly indicated that he could be fair and no evidence has been presented to this Court that Juror Marshall's decision resulted from anything other than the evidence presented, we cannot conclude that the trial court abused its discretion in allowing Juror Marshall to serve on the jury.

Finally, we note that some concerns regarding Juror Council's ability to continue serving on the jury were made known during trial. Depending on the type of for-cause challenge, challenges may be made either up to the time of the jury verdict or even after the jury reaches a verdict. *See generally* **McDonald**, 2012 WL 504510, at *20 (discussing the different types of challenges). In a centuries-old case, the Tennessee Supreme Court first recognized the fact that where "the juror in question was not in a state of mental and bodily health enabling him to perform his duties intelligently," a new trial should be awarded. **Hogshead v. State**, 25 Tenn. 59, 60 (Tenn. 1845). Moreover, federal courts have recognized that "a juror's physical and mental capacity for service can change throughout trial." **United States v. Huntress**, 956 F.2d 1309, 1313 (5th Cir. 1992).

Here, after initial questions were raised as to Juror Council's competence, the trial court questioned Juror Council and he informed the trial court of his education level, work experience, and other considerations. After this examination, the trial court was satisfied with Juror Council's competence and, as discussed *supra*, Defendants chose not to use a peremptory challenge on Juror Council. Weeks later, however, Juror Council sent a note to the trial judge indicating that he needed to see his psychiatrist because he was "off his meds." Juror Council had previously stated that he was not taking any medications. Based on this note, the trial court called Juror Council's social worker in the presence of counsel for all parties; the social worker explained that Juror Council was experiencing some difficulties, as he suffered from anxiety. When questioned as to whether Juror Council could stay on the jury, the social worker indicated that Juror Council was "just . . . nervous" and that he could see his psychiatrist the next week. As such, the trial court allowed Juror Council to remain on the jury and a verdict was announced shortly thereafter.

From the record, we cannot conclude that the trial court committed an abuse of discretion in this regard. First, we note that unlike the cases cited by Defendants in support of their position, there is no evidence that Juror Council was suffering from delusions during the trial. *See* **Sullivan v. Fogg**, 613 F.2d 465, 467 (2d Cir. 1980) (where the juror stated that he has hearing voices). Nor is this a case wherein the trial court exercised its discretion to excuse a juror after "significant evidence" that the juror was incompetent, including getting into a minor altercation with another juror and not remembering the encounter moments later. *See* **United States v. Gonzalez-Soberal**, 109 F.3d 64, 68 (1st Cir. 1997). Instead, the trial court exercised its broad discretion to allow

Juror Council to remain after hearing from his social worker that he was suffering from anxiety but could continue to serve as a juror. Moreover, although Defendants take issue with the fact that Juror Council discussed the proceedings with his social worker, Defendants do not assert in their brief that these conversations involved anything related to the substantive merits of this case; rather, it appears that only Council Juror's mental health was discussed.[11]

Likewise, the evidence that Juror Council posted on social media following the jury verdict in favor of Plaintiff is insufficient to show a bias on Juror Council's part that would necessitate a new trial. At the time of the posting, Juror Council had heard the evidence concerning Allenbrooke's alleged negligence and the injuries sustained by Mrs. Pierce. In a different context, we have previously held that bias generally "must come from an extrajudicial source and not result from the [] impressions during trial." ***Eldridge v. Eldridge***, 137 S.W.3d 1, 7 (Tenn. Ct. App. 2002) (involving judicial recusal). Finally, we note that extrajudicial evidence concerning juror deliberations is generally limited to information concerning "whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion," rather than information concerning the juror's internal thought processes. Tenn. R. Evid. 606(b); *see also* ***State v. Smith***, 418 S.W.3d 38, 48 (Tenn. 2013) (applying Rule 606(b)'s limitations to a social media exchange). On the whole, we cannot conclude that Defendants have shown that the trial court caused an injustice by applying an incorrect legal standard, reaching an illogical decision, or basing its decision on a clearly erroneous assessment of the evidence. *See* ***Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010). As such, there was no abuse of discretion in the trial court's decision to allow Juror Council to remain on the jury and no new trial is warranted on this basis. *See* ***Danmole***, 933 S.W.2d at 487 (holding that the trial court's assessment of a juror's qualifications is reviewed for an abuse of discretion).

### III. Evidentiary Issues

We next consider the evidentiary issues raised by Defendants. Issues regarding the admission of evidence are reviewed for an abuse of discretion. ***Commercial Bank & Tr. Co. v. Children's Anesthesiologists, P.C.***, 545 S.W.3d 470, 474 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Feb. 14, 2018). "[T]rial courts are accorded a wide degree of

---

[11] It further appears that counsel for Defendants agreed that such discussions were proper. When discussing the possibility that Juror Council had discussed the merits of the case with his social worker, the trial court stated that they could ask the social worker about the conversations, but that, as of what they knew at that time, it appeared that the conversation was confined to Juror Council stating: "I'm nervous. I'm serving on a jury." Counsel for Defendants agreed that such a conversation was "fine." Defendants do not point to any evidence that the social worker was further questioned or indicated that the substantive merits of the case was ever discussed.

latitude in their determination of whether to admit or exclude evidence[.]" ***Dickey v. McCord***, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). According to the Tennessee Supreme Court,

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

### A. Testimony of Victoria Fierro

We first determine whether the trial court should have excluded the testimony of Victoria Fierro as a summary witness. Again, a brief procedural history is helpful to the analysis of this issue. Here, Plaintiff disclosed Ms. Fierro as witness on January 19, 2015. Following some dispute about the timeliness of the disclosure, Plaintiff stated by letter of July 14, 2015, that Ms. Fierro would not be providing opinion testimony, but would rather solely testify as a summary witness. This statement was confirmed in a July 2015 supplemental expert disclosure in which Plaintiff stated that Ms. Fierro would only testify to "summaries, charts, graphs, timelines," and the like. After Defendants moved to exclude Ms. Fierro on the basis that the disclosures did not provide sufficient information regarding Ms. Fierro's expert opinions, Plaintiff again noted that Ms. Fierro was not an expert and therefor would not "testify to the truth of the contents of any documents." The trial court later entered an order noting that the parties had agreed that Ms. Fierro "will be offering summaries, not opinions." Ms. Fierro was thereafter called to testify both in the compensatory damages phase of trial and the punitive damages phase.[12]

During her testimony in the compensatory damages phase of trial, Ms. Fierro first detailed her experience, which included working as a forensic accountant and consultant, with experience in tax fraud, accounting in a health care setting, and Medicaid and Medicare reimbursements. Ms. Fierro testified that the summary chart she prepared compared Allenbrooke's budget for nursing staff with the nursing home's "expected" staffing levels, as determined on an hours per patient per day, or "HPPD," basis. To calculate the "expected" staff level, Ms. Fierro relied on data compiled by the Center for

---

[12] Defendants focus solely on the compensatory damages portion of Ms. Fierro's testimony in their initial brief. Indeed, Defendants do not discuss the testimony elicited in the punitive damages portion of trial until their reply brief. Again, issues must be raised in initial briefs. Moreover, as discussed in detail, *infra*, we vacate the punitive damages award and remand for a new hearing on this issue. We therefore confine our review to Ms. Fierro's testimony in the compensatory damages phase of trial.

Medicare and Medicaid Services, or "CMS." CMS published a governmental study that details the expected staff needed to care for patients depending on their care needs, or RUG score. Comparing Allenbrooke's expected staffing needs as extrapolated from the CMS data to Allenbrooke's budget for staffing during this time, Ms. Fierro ultimately calculated that "[i]f [Allenbrooke] had staffed to the expected, it would have cost them $1,669,761 more than it did." Defendants objected multiple times throughout Ms. Fierro's testimony, cross-examined Ms. Fierro, and called their own witness who testified that comparing CMS "expected" staffing to budgeted staffing was not the proper method of calculating purported understaffing, as other methods, including the actual staffing reported by Allenbrooke, were more accurate,[13] and CMS "expected" staffing levels are used for billing and not staffing decisions. Defendant's expert instead opined that Allenbrooke exceeded all state and federal staffing guidelines, often spent more on staffing than was budgeted, and staffed at an appropriate level.

Summaries are authorized by the Tennessee Rules of Evidence:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The originals or duplicates shall be made available for examination or copying, or both, by other parties at reasonable times and places. The court may order that they be produced in court.

Tenn. R. Evid. 1006. "For [a Rule 1006] summary to be admissible, the party seeking admission must lay the proper foundation, consisting of testimony that '(1) the original evidence is voluminous, and (2) the summary is sufficiently accurate in representing the original evidence.'" *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *4 (Tenn. Ct. App. Dec. 19, 2002) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 10.06(3) at 10-21 (4th ed. 2000)).

Because relatively few cases have addressed concerns related to Rule 1006 summaries, and in particular the use of summary witnesses, we may look to Rule 1006's substantially similar federal counterpart for persuasive authority regarding the rule's construction. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 430 (Tenn. 2011) (citing *Harris v. Chern*, 33 S.W.3d 741, 745 n.2 (Tenn. 2000)); *see* Fed. R. Evid. 1006 (providing a substantially similar rule to Tennessee's version of Rule 1006).[14]

---

[13] When questioned on cross-examination about her failure to look to the actual staffing numbers reported by Allenbrooke, Ms. Fierro testified that she could not confirm the numbers due to inadequate production of time cards by Allenbrooke, specifically that the time cards omitted some necessary information. Defendants' expert testified that the time cards were complete and accurate and showed appropriate levels of staffing.

[14] Specifically, Federal Rule 1006 provides:

The proponent may use a summary, chart, or calculation to prove the content of

The United States Court of Appeals for the Sixth Circuit has provided a more detailed description of what is required to qualify for admission under Rule 1006:

> This court has interpreted Rule 1006 as imposing five requirements for the admission of an evidentiary summary: (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002) (citing *United States v. Bray*, 139 F.3d 1104, 1109–10 (6th Cir. 1998)). Here, Defendants do not assert that the documents involved were not voluminous, that the documents were not properly made available, that the underlying documents were inadmissible, or that the summary evidence was presented by a witness who did not supervise its preparation. Rather, Defendants assert that the summary provided by Ms. Fierro did not meet the requirement to be "accurate and nonprejudicial." *Modena*, 302 F.3d at 633. As such, Defendants argue that Ms. Fierro's testimony was beyond the scope of a summary witness, instead including opinions that veered into the testimony of an expert. Defendants further assert that testifying as an expert is a role which Ms. Fierro was ordered not to inhabit and in which the trial court failed to assess the admissibility of the evidence under the rules applicable to expert testimony.

Federal courts have previously grappled with similar questions regarding whether a summary was "accurate and nonprejudicial." For example, in *United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998), the Sixth Circuit described this requirement as follows:

> This means first that the information on the document summarizes the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner. Nothing should be lost in the translation. It also means, with respect to summaries admitted in lieu of the underlying documents, that the information on the summary is not embellished by or annotated with the conclusions of or inferences drawn by the proponent, whether in the form of labels, captions, highlighting techniques, or otherwise. Once a Rule 1006 summary is admitted, it may go to the jury

---

voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

room, like any other exhibit. Thus, a summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations, particularly when the jurors cannot also review the underlying documents.

*Id.* at 1110. At least one federal district court has gone so far as to say that a Rule 1006 summary cannot contain "any hint or suggestion in the summary of a conclusion that the party proffering the summary hopes the jury will reach on some disputed issue of fact." *Anderson v. Otis Elevator Co.*, No. 11-10200, 2012 WL 5493383, at *3 (E.D. Mich. Nov. 13, 2012) (citing *Bray*, 139 F.3d at 1111); *see also Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159–60 (11th Cir. 2004) (quoting *United States v. Smyth*, 556 F.2d 1179, 1184 n.12 (5th Cir. 1977)) ("[B]ecause 'summaries are elevated under Rule 1006 to the position of evidence, care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes.'").

Defendants assert that the summary testimony provided by Ms. Fierro in this case did not meet this standard because she chose to rely on certain information supporting Plaintiff's position, while allegedly ignoring other information that called that position into question. From our review, however, federal courts have held that the dangers posed by summaries can sometimes be alleviated where the party opposing the summary had a full opportunity to cross-examine the witness. *See, e.g. United States v. Jones*, 135 F.3d 771 (4th Cir. 1998) (quoting *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir.1991), *superseded by statute on other grounds as stated in United States v. Caseslorente*, 220 F.3d 727, 736 (6th Cir. 2000)) ("It is important, however, that opposing counsel is provided with the opportunity to cross-examine the witness whose summarized testimony has been introduced in order to 'alleviate any danger of inaccuracy or unfair characterization.'"); *United States v. Zeman*, 978 F.2d 1260 (6th Cir. 1992) (holding that the defendant's cross-examination of the witness concerning the preparation of the summary and its meaning alleviated "any danger of inaccuracy or unfair characterization").

This rule was applied in a more recent case authored by the Sixth Circuit. *See United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015). In *Kilpatrick*, the defendants objected to a summary because the government agents relied on only some test messages to draw conclusions regarding ambiguous statements; only a small percentage of the test messages were shown to the jury. The Sixth Circuit held, however, that the evidence was not improper because the defendants "had access to all the evidence cited by the agents, they were free to challenge the accuracy of any summary testimony through cross-examination." *Id.* Thus, where "both parties possess the entire collection of recordings or writings, Rule 1006 witnesses can be cross-examined about the accuracy of their summaries." *Id.*

Here, Defendants assert in their brief that Ms. Fierro "created and presented one-sided, unduly prejudicial exhibits, selectively highlighting only the portions of the [] Reports supposedly favorable to Plaintiff and opining that other data points were not relevant." As an initial matter, Defendants did not assert at trial that any of the information contained in Ms. Fierro's chart or testimony was inaccurate.[15] Rather, the alleged inaccuracy resulted from the information on which Ms. Fierro chose to rely. Additionally, there can be no dispute that Ms. Fierro's testimony concerning her chart was subjected to vigorous cross-examination by Defendants.[16] Indeed, of the five allegedly improper opinions given by Ms. Fierro cited in Defendants' brief, four occurred during cross-examination. Moreover, in addition to cross-examining Ms. Fierro, Defendants called their own witness to rebut Ms. Fierro's statements. Thus, while it is alleged that Ms. Fierro presented incomplete information, the alleged omissions were brought to the attention of the jury by Defendants. Consequently, any danger of unfair prejudice that resulted from Ms. Fierro's decision to summarize allegedly incomplete information was largely alleviated. See *Kilpatrick*, 798 F.3d at 383. Given the fact that both sides were fully able to present evidence on this issue, it appears that the jury was best able to choose the narrative that was more credible in their eyes.

Defendants additionally argue, however, that Ms. Fierro improperly testified outside the scope of her role as a summary witness by expressing opinions regarding the data she presented, specifically citing five instances of improper opinion. First, we dispense with any argument concerning the alleged opinions elicited during cross-examination. Here, Defendants sought to cross-examine Ms. Fierro for the basis of her data, in particular why she chose to rely on certain data to the exclusion of others. This line of questioning led Ms. Fierro to state certain purported "opinions" concerning the unreliability of data that she excluded and the favorability of the data she chose. It is well-settled, however, that where certain allegedly inadmissible statements are elicited on cross-examination, the party who elicited the testimony cannot object unless the

---

[15] Specifically, the record on appeal contains the following exchange regarding the summary at issue:

THE COURT: So does that mean, yes, all of those figures on that bar are correct for what they purport to be?
[Counsel for Defendants]: Those are what they purport to be, Your Honor.

[16] Defendants assert, however, that their cross-examination of Ms. Fierro was unduly limited by the trial court, who refused to allow Defendants to cross-examine Ms. Fierro as to the budgets of other nursing homes. As an initial matter, we note that Defendants cite no law in support of this argument. *See Sneed*, 301 S.W.3d 615 (holding that an issue may be waived where the proponent fails to cite legal authority in support of the argument). Moreover, both at trial and on appeal, Defendants insist that Ms. Fierro's testimony be limited only to providing a summary of the documents relating to Allenbrooke. Anything more, they contend, is impermissible expert opinion. Comparisons of Allenbrooke's budget to the budgets of other nursing homes simply does not fall within the scope of summary testimony, as determined by the trial court's order on the motion in limine. As such, we discern no abuse of discretion in the trial court's decision to limit Defendants' ability to cross-examine Ms. Fierro on these matters.

- 21 -

statements were unresponsive to the question asked. *See **Baxter v. State***, 83 Tenn. 657, 663 (Tenn. 1885) ("[I]t is equally well settled that a party who elicits illegal evidence cannot object to it, unless it is shown not to have been responsive to the question."); ***State v. Rochelle***, No. M2011-02639-CCA-R3-CD, 2013 WL 285747, at *11 (Tenn. Crim. App. Jan. 25, 2013) (quoting ***Pulley v. State***, 506 S.W.2d 164, 168 (Tenn. Crim. App. 1973) ("A defendant cannot be heard to complain about incompetent evidence he elicits by cross-examination.")). Here, Defendants do not assert in their brief that these statements were unresponsive to the questions presented. As such, Defendants cannot now object to the testimony that was elicited therefrom.

A single remaining objectionable statement was elicited during redirect. According to Defendants, this statement was an opinion "that Allenbrooke allegedly spent less on care using this false comparison of Expected HIPPD and budgeted HIPPD." At issue is an exchange in which counsel for Plaintiff asked Ms. Fierro to calculate "the financial results of staffing in accordance with the budget," in comparison to the expected level of staffing according to federal guidelines for certain types of Medicare patients. Ms. Fierro testified as to her calculation that subtracting the "budgeted" RN time from the "expected" RN time "comes to $1,669.761." Following this calculation, the following exchange occurred:

Q. Is that a cost to the facility or a savings to the facility for that practice?
[Counsel for Defendants]: Objection, Your Honor.
THE COURT: What's difference in the two numbers?
BY [Counsel for Plaintiff]:
Q. What's the difference in the two numbers? Is that the $1,669,761?
A. Right. I call that the savings impact. If they had staffed to the expected, it would have cost them $1,669,761 more than it did.

We agree that this statement contains an implicit conclusion that Allenbrooke saved funds by not "staff[ing] to the expected." We also concede that the trial court's order disallowing Ms. Fierro from testifying to her "opinions" somewhat complicates this issue. Generally, however, summaries "may include assumptions and conclusions," so long as the evidence relied upon is in the record.[17] ***United States v. Wainright***, 351 F.3d 816, 820–21 (8th Cir. 2003) (citing ***United States v. Lewis***, 759 F.2d 1316, 1329 n.6 (8th Cir.), cert. denied, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985)). Thus, where a summary witness explained in detail how he developed his summary of the data and how he made the assumptions and conclusions at issue based upon the evidence collected, the summary was not found to be prejudicial or misleading so as to necessitate a finding that the trial court abused its discretion in admitting it. ***Id.***

---

[17] Defendants do not argue that Ms. Fierro improperly relied on inadmissible evidence or that evidence was not properly included as part of the record.

The conclusion drawn by Ms. Fierro in the above testimony veers perilously close to the line between summary testimony and expert testimony. In reaching our decision on this issue, however, we must be mindful of the standard of review applicable to the issue. As previously discussed, trial courts are afforded broad discretion in determining the admissibility of evidence and we do not overturn their decisions where reasonable minds could differ. *See Eldridge*, 42 S.W.3d at 85. Moreover, we note that the limitations placed on Rule 1006 summaries result from the fact that these summaries are considered substantive evidence and are therefore allowed in the jury room during deliberations. *See Bray*, 139 F.3d at 1110 ("Once a Rule 1006 summary is admitted, it may go to the jury room, like any other exhibit. Thus, a summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations, particularly when the jurors cannot also review the underlying documents."); *Anderson*, 2012 WL 5493383, at *3 (drawing a distinction between summaries submitted as evidence to the jury and documents which merely aid the jury's examination; noting that the second type of documents are generally "akin to argument" and therefore not governed by the limitations applicable to Rule 1006 summaries). From our review of the voluminous record, however, it is not clear that the summary prepared by Ms. Fierro that was objectionable to Defendants was actually made an exhibit in this case. Here, both parties' briefs and the testimony at issue refer to Ms. Fierro's exhibit as a bar chart.[18] While the parties' briefs reference this bar chart and the testimony surrounding it, neither party cites to the specific exhibit number where this chart may be found. *See generally* Tenn. R. Ct. App. 6(a)(1) (requiring that, in order to raise an error, the appellate brief contain "a statement . . . of alleged erroneous action of the trial court . . . with citation to the record where the erroneous or corrective action is recorded"). Indeed, from Ms. Fierro's testimony, it is unclear if this objectionable exhibit was even entered into evidence. In the absence of proof that this document was actually entered as exhibit and given to the jury,[19] it is not clear that the heightened protections applicable to Rule 1006 summaries are even applicable in this case.

Moreover, other courts have held that summary witnesses may testify as to assumptions and conclusions regarding the data summarized. *See Wainright*, 351 F.3d at 820–21. The fact that the summary witness testified as such does not transform the testimony into expert testimony. *See id.* at 819–820 (not describing the summary witness, an investigator, as an expert or considering the admissibility of his testimony in the context of expert proof). Ms. Fierro clearly made assumptions and offered conclusions

---

[18] Another chart is included in the record. This chart, however, does not appear to be the color-coded "bar" chart to which Defendants lodged their strongest objection. Instead, when the chart contained in the record, Exhibit 74, was admitted into evidence, there was no objection from Defendants.

[19] The record in this case spans twenty-two banker's boxes and includes a multitude of documents specifically excluded by our rules. *See generally* Tenn. R. App. P. 24(a) (governing the contents of the record on appeal). It is not this Court's duty to conduct an archeological dig of the record to find a document where the party complaining of its entry has failed to direct this Court to its location.

regarding the data she presented. Defendants, however, were able to cross-examine Ms. Fierro and even presented their own witness to rebut Ms. Fierro's testimony. Considering the totality of the circumstances, at most, reasonable minds could disagree as to the propriety of Ms. Fierro's testimony. *Eldridge*, 42 S.W.3d at 85.  As such, Defendants have not shown an abuse of discretion in the trial court's decision.[20]

### B. Testimony of Allenbrooke's Former Employees

Next, Defendants assert that the trial court erred in allowing Plaintiff to present the testimony of several former Allenbrooke employees, which testimony Defendants contend was irrelevant and unduly prejudicial, while preventing Defendants from properly cross-examining these witnesses. Here, Plaintiff called six former employees of Allenbrooke in her case-in-chief. Each former employee testified in some fashion that Allenbrooke was understaffed and that patients, particularly those that were required to be repositioned to prevent pressure sores, were not properly cared for due to lack of sufficient staff. Defendants raise a multitude of alleged errors with regard to these witnesses, which we will address in turn.

First, Defendants assert that the evidence was not relevant. The Tennessee Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence." Tenn. R. Evid. 401. The Tennessee Supreme Court has described this as "a relatively lenient threshold[.]" *State v. Gilliland*, 22 S.W.3d 266, 271 (Tenn. 2000). The evidence here was clearly relevant. The witness all worked at Allenbrooke around the relevant time period and had personal knowledge of the staffing levels and care that was provided to patients there. Although these witnesses were allowed to testify as to generalized care during the time frame at issue, this testimony was relevant to Plaintiff's assertion that a pattern or practice of Allenbrooke's, beginning with the non-Allenbrooke Defendants, resulted in the substandard care at issue. Indeed, this pattern or practice made up the bulk of Plaintiff's argument that it was entitled to punitive damages based on reckless or grossly negligent conduct.

---

[20] Defendants also assert that the trial court erred in not providing a limiting instruction to the jury regarding the Rule 1006 summary.  "When [the trial] court sends a chart or diagram admitted under Rule 1006 to a jury, a limiting instruction is appropriate." *Wainright*, 351 F.3d at 821 (citing *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988)). In addition to the fact that the record is unclear as to whether the summary at issue was actually sent to the jury, Defendants did not raise this issue in their motion for new trial. As such, this issue is waived. *See* Tenn. R. App. P. 3(e)"[I] all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, *jury instructions granted or refused*, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.") (emphasis added).

The Tennessee Supreme Court has previously held that a nursing home may be liable for injuries that resulted from understaffing the facility. *See **Wilson v. Americare Sys., Inc.**,* 397 S.W.3d 552, 563–64 (Tenn. 2013). In that case, the evidence included general testimony about understaffing that was not always specific to the decedent. *Id.* at 559 (concerning evidence that the nursing home failed to provide adequate staff "to meet the needs of the residents"). *Id.* at 559. Likewise, this Court has held that evidence of understaffing problems at the facility was relevant in the context of a request for punitive damages against a nursing home where the patient suffered similar injuries to Mrs. Pierce. *See **Smartt v. NHC Healthcare/McMinnville, LLC**,* No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *13 (Tenn. Ct. App. Feb. 24, 2009) (discussed in detail, *infra*). Defendants cite no caselaw in which a trial court was found to have abused its discretion in ruling that this type of evidence was relevant. As such, we simply cannot conclude that the trial court applied an incorrect legal standard, reached an illogical decision, or based its decision on a clearly erroneous assessment of the evidence in ruling that this evidence was relevant.

Nevertheless, evidence that is relevant may still be excluded when it meets an exception outlined in Rule 403 of the Tennessee Rules of Evidence: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." As such, Defendants assert that the evidence was cumulative. Although Defendants somewhat address their argument that the evidence was cumulative in their brief, Defendants do not point out where an objection to the cumulative nature of this evidence was raised contemporaneously at trial.[21] *See **State v. Thomas**,* 158 S.W.3d 361, 400 (Tenn. 2005) (holding that the State's position—that an objection to cumulative evidence was waived where no contemporaneous objection was entered at trial— was well taken, but electing to review the issue on the merits); *see also* Tenn. R. Evid. 103(a)(1) (noting that error may not be predicated on the admission of evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context").

Under Rule 6(a) of the Rules of the Tennessee Court of Appeals, appellant's briefs must include.

(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of

---

[21] At one point, counsel for Defendants does state that some evidence was cumulative. This objection was somewhat buried in a bench conference that covered multiple issues, rather than contemporaneously. In addition, this was the only time an objection to the cumulative nature of the six former Allenbrooke's employees' testimony was lodged. Coupled with Defendants' failure to comply with the rules of this Court, we cannot conclude that this was sufficient to preserve this issue on appeal.

the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.

(2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.

(3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.

(4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

It is not this Court's duty to comb through the appellate record to find support for an appellant's assertions of error. *See Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 616 (Tenn. Ct. App. 2015) (quoting *Flowers v. Bd. of Professional Responsibility*, 314 S.W.3d 882, 899 n. 35 (Tenn. 2010)) ("'[J]udges are not like pigs, hunting for truffles' that may be buried in the record, . . . or, for that matter, in the parties' briefs on appeal."). In the absence of an appropriate statement in Defendants' brief noting where this issue was seasonably called to the trial court's attention, this issue is waived. *Cf. Berry v. City of Memphis*, No. W2014-01236-COA-R3-CV, 2015 WL 1650763, at *3 (Tenn. Ct. App. Apr. 13, 2015) (holding that an alleged error was waived where it was not shown to have been seasonably called to the trial court's attention).

Defendants next assert that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Here, the witnesses had personal knowledge of the staffing and care of Allenbrooke residents. Some witnesses testified specifically about Mrs. Pierce's care, while others testified about the care received by other patients during the same time frame. Again, Defendants cite no caselaw in which a trial court's decision to admit similar evidence was found to be an abuse of discretion. We likewise do not discern one in this case.

"Generally speaking, most all evidence presented by one side at trial is, at least, intended to be prejudicial to the other side." *State ex rel. Com'r of Transp. v. Meek*, No. E2012-01177-COA-R3-CV, 2013 WL 6529569, at *5 (Tenn. Ct. App. Dec. 13, 2013). Only evidence in which the danger of "unfair" prejudice substantially outweighs its probative value should be excluded. Tenn. R. Evid. 403. Unfair prejudice is defined as "the undue tendency to suggest a decision based on improper considerations; it 'does not mean the damage to a [party's] case that results from the legitimate probative force of the evidence.'" *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 353 (Tenn. Ct. App. 1999) (quoting *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 515 (6th Cir. 1996)). As the Tennessee Supreme Court has explained,

Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. *See Roy v. Diamond*, 16 S.W.3d 783, 791

(Tenn. Ct. App. 1999). "Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999).

*State v. James*, 81 S.W.3d 751, 757–58 (Tenn. 2002).

Here, the evidence was highly probative of Allenbrooke's alleged practice of understaffing and Defendants have failed to show how its probative value was substantially outweighed by the danger that the jury would base its decision on improper considerations. Defendants therefore did not meet their burden of persuasion to justify the extraordinary remedy under Rule 403. As such, there was no abuse of discretion in the admission of this evidence.

Defendants next assert that the trial court erred in allowing counsel for Plaintiff to examine these former employees by way of leading questions. "[T]he propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993). Pursuant to Rule 611 of the Tennessee Rules of Evidence, "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). Leading questions are generally only permitted in certain circumstances:

> (1) Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony. Leading questions should be permitted on cross-examination.
> (2) When a party calls a hostile witness, an adverse party (or an officer, director, or managing agent of a public or private corporation or of a partnership, association, or individual proprietorship which is an adverse party), or a witness identified with an adverse party, interrogation may be by leading questions. The scope of cross-examination under this paragraph shall be limited to the subject matter of direct examination, and cross-examination may be by leading questions.

Tenn. R. Evid. 611(c). Like the other evidentiary issues raised in this case, the trial court's decision to treat a witness as hostile and allow leading questions is reviewed for an abuse of discretion. *See State v. McKnight*, No. W2010-00688-CCA-R3-CD, 2011 WL 744746, at *8 (Tenn. Crim. App. Mar. 1, 2011).

Regardless of whether the trial court abused its discretion in allowing leading questions of these witnesses, we conclude that this argument is waived. Pursuant to Rule 3(e) of the Tennessee Rules of Appellate Procedure,

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

In determining whether the degree of specificity required by Rule 3(e), this Court has opined as to the following requirements:

First, the motion should contain a concise factual statement of the error, "sufficient to direct the attention of the court and the prevailing party to it." *Johnson*, 114 Tenn. at 644, 88 S.W. at 170–71. Under this standard, it is clearly improper to simply allege, in general terms, that the trial court committed error, either by taking some action or by admitting or excluding evidence; rather, the motion should identify the specific circumstances giving rise to the alleged error so that it may be reasonably identified in the context of the entire trial. *See State v. Ashburn*, 914 S.W.2d 108, 114 (Tenn. Crim. App. 1995). . . .

Second, as it is well-settled in law that a general objection is usually not sufficient to assign error, Tenn. R. Evid. 103(a)(1); *Jack M. Bass & Co. v. Parker*, 208 Tenn. 38, 48, 343 S.W.2d 879, 883 (1961), the motion should also contain a specific legal ground alleged for the error. Accordingly, in addition to setting forth a concise statement of the factual grounds, a well-drafted motion for a new trial should also identify, with reasonable clarity, the legal ground upon which the trial court based its actions and contain a concise statement asserting the legal reasons why the court's decision was improper. However, because motions for a new trial should not be expanded "into all the voluminosity of 'briefs' and printed arguments," *National Hosiery & Yarn Co. v. Napper*, 124 Tenn. 155, 171, 135 S.W. 780, 784 (1911), the movant is not required to identify such errors in the motion with the same precision expected in the appellate courts. Therefore, precise citation to a rule, statute, or case as the legal ground for the alleged error is normally not required to preserve the issue for appeal under Rule 3(e), although to the extent that citation to authority aids in fairly bringing the legal nature of the error to the attention of the trial judge, such a practice ought to be encouraged.

Finally, Rule of Appellate Procedure 1 provides that the Rules "shall be construed to secure the just, speedy, and inexpensive determination of every proceeding on its merits." Accordingly, when an appellate court reviews a motion for a new trial under Rule 3(e), it should view the motion

in the light most favorable to the appellant, and it should resolve any doubt as to whether the issue and its grounds were specifically stated in favor of preserving the issue. Any other method of review would result in needlessly favoring "technicality in form" over substance, a practice specifically discouraged by the comments to Rule 1. . . .

*Fahey v. Eldridge*, 46 S.W.3d 138, 142–44 (Tenn. 2001) (footnotes omitted). Applying this standard, the Tennessee Supreme Court concluded that several errors were stated with sufficient specificity so as to be preserved for appellate review, where both factual allegations and legal grounds were cited to call the court's attention to the alleged errors. *Id.* at 144.

Here, even giving Defendants the benefit of all reasonable inferences, we cannot conclude that the motion for new trial alleged an error regarding the trial court's allowance of leading questions during the direct examinations of Allenbrooke's former employees with sufficient specificity. While Defendants' failure to cite to Rule 611 in their motion for new trial may be excused on the basis of the Tennessee Supreme Court's decision in *Fahey*, we cannot overlook that the motion for new trial simply did not mention any error regarding the leading questions; instead, this issue, including any factual allegations involving the issue or any legal grounds showing that the trial court erred, was completely omitted from the motion for new trial. As we perceive it, the decision in *Fahey* does not excuse litigants from the requirements of Rule 3(e), nor does it require this Court to consider issues that simply were not preserved for appellate review. Consequently, we conclude that this issue is waived.

Finally, Defendants contend that the trial court erred in barring Defendants from inquiring as to the former employees' bias against Allenbrooke during cross-examination. Here, during the discovery process, Defendants invoked a statutory privilege under Tennessee Code Annotated section 68-11-272 to prevent the discovery of all employee personnel files. Plaintiff thereafter filed a motion in limine to exclude mention of the contents of the personnel files, including facts pertaining to any disciplinary matters or terminations from Allenbrooke that were included. Defendants responded in opposition, arguing that they could question the former employers regarding their own employment history. On June 24, 2016, the trial court entered an order granting Plaintiff's motion in limine, which stated that, "Defendants are prohibited from questioning witnesses using these personnel files or information contained in the personnel files. Defendants may ask general questions such as an employee's name, address, and current employment. Defendants may ask whether an individual is a current or former employee." Later, the trial court orally clarified that Defendants were allowed to inquire as to whether the former employers were "fired from Allenbrooke," but not why the employee was terminated. During trial, however, the trial court appeared to reverse course, ruling that Defendants could not ask former Allenbrooke employees if they had been terminated.

Defendants argue that the trial court's decision results in a "trial-by-ambush" and prevented Defendants from properly delving into the former employee's biases.

Evidence of bias is a proper ground for impeachment of a witness. *See* Tenn. R. Evid. 616, adv. comm'n cmt. (citing ***Creeping Bear v. State***, 113 Tenn. 322, 87 S.W. 653 (1905)) ("Bias is an important ground for impeachment."):

> "It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony." ***Creeping Bear v. State***, 87 S.W. at 653. "The rule of admissibility of evidence to show bias or interest of a witness encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of a cause only." ***Whittemore v. Classen***, 808 S.W.2d 447, 452 (Tenn. Ct. App. 1991) (citing ***Majestic v. Louisville & N.R. Co.***, 147 F.2d 621 (6th Cir.1945)). . . .
> Tennessee Rule of Evidence 611(b) is also relevant to our analysis, as it provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" This Rule allows for the "wide-open scope of cross-examination historically favored in Tennessee." Tenn. R. Evid. 611, Adv. Comm'n Cmt. "It is well established that wide latitude should be afforded on cross-examination." ***Steele v. Ft. Sanders Anesthesia Group, P.C.***, 897 S.W.2d 270, 278 (Tenn. Ct. App. 1994). "Furthermore, a witness may be cross-examined to show possible prejudice or bias, and this right should be limited only upon a showing of the most extraordinary circumstances." ***Id.*** (citing ***Phillips v. Pitts***, 602 S.W.2d 246, 249 (Tenn. Ct. App. 1980)).

***Laseter v. Regan***, 481 S.W.3d 613, 632 (Tenn. Ct. App. 2014).

Here, Plaintiff does not argue, nor did the trial court rule, that the information regarding whether the former employees had been fired from Allenbrooke or other nursing homes was actually privileged pursuant to section 68-11-272. *See generally* ***Pinkard v. HCA Health Servs. of Tenn., Inc.***, 545 S.W.3d 443, 453–58 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Nov. 16, 2017) (discussing the privilege provided by section 68-11-272). Indeed, this Court has previously opined that "persons who provided testimony or information to or as part of a [quality improvement committee] are not exempt from discovery and are not prohibited from testifying as to their knowledge of facts or their opinions." ***Id. at*** 453 (citing Tenn. Code Ann. § 68-11-272(c)(2)). Instead, it appears that the trial court's ruling was predicated on issues of fairness. As such, Plaintiff argues on appeal that this material was properly excluded where its probative value was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *see*

*also* 98 C.J.S. *Witnesses* § 712 ("[R]elevant evidence of bias is subject to balancing and may be excluded if it would result in unfair prejudice to the witness or a party, and such prejudice substantially outweighs its probative value.").

Again, we note that the exclusion of evidence based on the danger of unfair prejudice is an extraordinary remedy. *See James*, 81 S.W.3d at 757–58. This rule is doubly true regarding the exclusion of bias evidence. *See Laseter*, 481 S.W.3d at 632. The trial court's written order and oral rulings provide little justification for the exclusion of this evidence. Moreover, the trial court gave inconsistent rulings with regard to whether this evidence would be admitted. Thus, we tend to believe that it was error to exclude evidence to show that the former employees had a bias against Allenbrooke. Even if we were to conclude that the trial court erred in this regard, however, Defendants must show that prejudice resulted from this error. *See Citadel Investments, Inc. v. White Fox Inc.*, No. M2003-00741-COA-R3-CV, 2005 WL 1183084, at *11 (Tenn. Ct. App. May 17, 2005) (citing *Coakley v. Daniels*, 840 S .W.2d 367, 371 (Tenn. Ct. App. 1992)) ("The burden to show prejudice, that the excluded or admitted evidence affected the judgment, is on the complaining party."). Following our review of the parties' briefs and the record, we conclude that Defendants failed to meet this burden.

Under Rule 36(b) of the Tennessee Rules of Appellate Procedure, a final judgment will not be set aside "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Errors like the one at issue here are therefore subject to a harmless error analysis. *See generally State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (discussing the different types of errors that may occur in trial). As explained by our supreme court,

> An erroneous exclusion of evidence is harmful "when considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *See In re Estate of Smallman*, 398 S.W.3d 134, 152 (Tenn. 2013) (quoting *State v. Gomez*, 367 S.W.3d 237, 249 (Tenn. 2012)) (internal quotation marks omitted); *see also* Tenn. R. App. P. 36(b). In a jury case, we must carefully examine the entire record to determine "whether [exclusion] of the evidence, more probably than not, influenced the jury's verdict." *See Smallman*, 398 S.W.3d at 152 ("[W]hether [the evidentiary error] is sufficiently prejudicial to require reversal depends on the substance of the evidence, its relation to the other evidence, and the peculiar facts and circumstances of the case."). We do not act as a second jury by combining our harmlessness inquiry with our own assessment of liability. *State v. Rodriguez*, 254 S.W.3d 361, 373–74 (Tenn. 2008). Rather, the goal is to identify the actual basis for the jury's decision, *State v. Mallard*, 40 S.W.3d 473, 489 (Tenn. 2001) (quoting *Momon v. State*, 18 S.W.3d 152, 168

- 31 -

(Tenn. 1999)), and to determine whether the exclusion of evidence, more probably than not, affected the verdict. ***Smallman***, 398 S.W.3d at 152.

***White v. Beeks***, 469 S.W.3d 517, 529 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015). In determining whether an error in excluding evidence was harmless, we may consider "'the importance of the witness'[s] testimony in the [] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [] case." ***State v. Bowman***, 327 S.W.3d 69, 92 (Tenn. Crim. App. 2009) (quoting ***Delaware v. Van Arsdall***, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

In order to determine whether the exclusion of this evidence was harmful, it is necessary to examine the evidence that was excluded. *See* ***Singh v. Larry Fowler Trucking, Inc.***, 390 S.W.3d 280, 285 (Tenn. Ct. App. 2012) (noting that an appellate court cannot determine whether an error was harmful "without knowing what the excluded evidence would have been"). To that end, Tennessee law requires that a party appealing the exclusion of evidence "make an offer of proof to enable the reviewing court to determine whether the trial court's exclusion of proffered evidence was reversible error." ***Id.*** at 286 (citing Tenn. R. Evid. 103(a)(2)). Thus, in order to prevail on appeal regarding the erroneous exclusion of evidence, the proponent of the evidence must show that "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." Tenn. R. Evid. 103(a)(2).

Here, Defendants do not assert in their brief or otherwise point to the portion of the record where a contemporaneous offer of proof was made as to the excluded evidence. *See* Tenn. R. Ct. App. 6(a)(1) (requiring in all appellant's briefs a "citation to the record where the erroneous or corrective action is recorded"). Still, the record and Defendants' brief makes clear that the substance of the evidence that was excluded involved impeachment evidence regarding the employment histories of the former Allenbrooke employees. *See* ***Singh***, 390 S.W.3d at 286 (quoting ***Gillum v. McDonald***, No. M2003-00265-COA-R3-CV, 2004 WL 1950730, at *5 (Tenn. Ct. App. Sept. 2, 2004)) ("'[A]n offer of proof is not needed when the substance of the evidence and its reason for exclusion are apparent from the context.'"). In order to determine the prejudicial effect of this alleged error, however, we must determine whether other witnesses who were not affected by the alleged exclusion of admissible evidence were also able to testify to the matters at issue. *See* ***Bowman***, 327 S.W.3d at 92 (directing courts to consider whether the evidence was cumulative or was corroborated by other evidence).

As pointed out by Defendants, Plaintiff called six different witnesses to testify about the conditions at Allenbrooke during the time of Mrs. Pierce's stay. Defendants do

not state in their brief, much less cite to evidence in the record identifying, which of these witnesses was specifically affected by the alleged erroneous exclusion of bias impeachment evidence. *See* Tenn. R. Ct. App. 6(a)(1). Moreover, even after reviewing the record as a whole, we can discern that only two of the six former Allenbrooke employees who testified were affected by the exclusion of this evidence. Specifically, it appears that Plaintiff filed portions of the depositions of Cheryl Gatlin-Andrews[22] and Querrida Johnson[23] in support of their motion in limine to exclude this testimony.[24]

In the absence of a specific citation by Defendants to proof identifying the specific witnesses affected by the exclusion of this evidence or indicating that the trial court excluded impeachment evidence against more than just two of Plaintiff's six witnesses on this issue,[25] we must conclude that any error in excluding this evidence was harmless. Here, while the evidence regarding the conditions at Allenbrooke were integral to Plaintiff's case, *see* **Bowman**, 327 S.W.3d at 92 (considering the importance of the evidence), it appears from the record on appeal that this evidence was presented by several witness for which no impeachment evidence has been cited by Defendants. *Id.* (considering whether the evidence was cumulative or corroborated by other witnesses). Thus, even if the jury were to discount the evidence presented by Ms. Gatlin-Andrews and Ms. Johnson, it could also have chosen to accept the testimony of the remaining four witnesses for which no bias evidence was presented. Likewise, Ms. Hatfield testified to her observations regarding Mrs. Pierce's care and no error has been alleged that bias evidence was improperly excluded during her testimony. As such, there was considerable "corroborating [evidence] of the[se] witness[es] on material points[.]" *Id.* Indeed, as previously discussed, it was Defendants' argument that this evidence was cumulative. Defendants were also permitted to present extensive testimony from other witnesses that there was no understaffing issue at Allenbrooke and that the issues that Plaintiff's witnesses observed were not true.

Finally, we note that Defendants' brief on this issue is largely deficient; rather than include any argument or analysis involving the prejudice that resulted from this error, Defendants merely include a conclusory statement that reversal is required due to this alleged error, as the jury must have been "substantially swayed by the error." **Kotteakos v. United States**, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557 (1946) ("If one

---

[22] Ms. Gatlin-Andrews's deposition indicates that her employment was terminated at other nursing homes. The portion of the deposition included in the record does not clearly indicate that she was fired from Allenbrooke. Accordingly, while this evidence may involve impeachment, Defendants have not shown that the excluded impeachment evidence involves bias against Allenbrooke.

[23] Ms. Johnson's entire deposition is included in the record.

[24] The motion also cites portions of the deposition of Lashandra Michelle Turner. Ms. Turner did not testify at trial.

[25] Again, we emphasize that it is not this Court's burden to comb the record to find support for the appellant's arguments. *See generally* **Cartwright**, 478 S.W.3d at 616. Here, Defendants failed to address specifically the impeachment evidence of any single witness, instead addressing the issue collectively.

cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.") In no way do Defendants' elaborate or explain in this section of their brief why the exclusion of this impeachment evidence constitutes a harmful error. Based on the totality of the evidence in the case and the parties' briefs, Defendants have failed to show that the jury's decision, more likely than not, would have been affected by the alleged error at issue. As such, any alleged error in the exclusion of this evidence does not necessitate reversal.

## C. Impeachment Evidence against Defendant's Expert

Defendants next assert that the trial court erred in allowing Plaintiff to cross-examine Plaintiff's nurse practitioner expert, Amanda Bailey, regarding her prior experience as an actress and her work with a professional acting coach.[26] Defendants assert that this evidence was irrelevant to her credibility as an expert and failed to have any effect on the basis of Ms. Bailey's opinions. Plaintiff argued at trial however, that the evidence was highly relevant to Ms. Bailey's credibility and "her whole performance here today[.]"

Again, as previously discussed, Rule 611 of the Tennessee Rules of Civil Procedure generally allows broad cross-examination, including with regard to credibility. *See* Tenn. R. Evid. 611. Its purpose is to enable the trier-of-fact to assess a witness's "'demeanor [and] sincerity[.]'" *Mayo v. Shine*, 392 S.W.3d 61, 67 (Tenn. Ct. App. 2012) (quoting *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). This rule is particularly apt in the context of expert witnesses: "Opposing counsel should be given broad latitude in their cross-examination [of an expert]." *Bradley v. Bishop*, 538 S.W.3d 518, 530 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 18, 2017) (quoting *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 197–98 (Tenn. Ct. App. 2008)). In particular, this Court has approved of cross-examination tactics intended to expose an expert as a "professional 'hired gun,' who earns a significant portion of his or her livelihood from testifying and . . . may have a general economic interest in producing favorable results for the employer of the moment." *Laseter v. Regan*, 481 S.W.3d 613, 628 (Tenn. Ct. App. 2014). The trial court's decision regarding the propriety, manner, or scope of cross-examination will not be interfered with in the absence of an abuse of discretion. *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012).

In this case, Ms. Bailey was clearly the type of professional expert witness in which cross-examination into her professional history and possible biases was appropriate. Indeed, Ms. Bailey's fee for testifying was well above the fee charged by the other experts associated with this case. As such, Defendants asserted that part of Ms.

---

[26] Ms. Bailey admitted to having been in more than ten films, seven of which included lead roles, as well as number of commercials and industrial films.

Bailey's cache resulted not just from her experience as a nurse practitioner, but also her experience as an actress. Although the evidence in this case does not fall squarely within the holding in *Laseter*, which involved financial information, evidence of Ms. Bailey's acting history was relevant to her sincerity and demeanor before the jury. *See Mayo*, 392 S.W.3d at 67 (citing *Overstreet*, 4 S.W.3d at 708). Like the financial information at issue, this evidence exposes Ms. Bailey's status as a professional expert witness, in this case, one arguably more apt at testifying than other expert witnesses, as illustrated by her acting training and elevated fee. Given the broad authority allowed when cross-examining expert witnesses, *see Bradley v*, 538 S.W.3d at 530, we cannot conclude that the trial court abused its discretion in admitting this evidence on the basis of relevance.

Defendants raise an additional argument, however—that this evidence should have been excluded for failure to comply with Rule 608 of the Tennessee Rules of Evidence. Under Rule 608, specific instances of conduct pertaining to the truthfulness or untruthfulness of a witness may only be inquired into on cross-examination where certain conditions are met, including a jury-out hearing on the probative value of the evidence and the recentness of the conduct at issue. *See* Tenn. R. Evid. 608(b). Again, Defendants fail to include a citation to the record where they objected under Rule 608 to the admission of this evidence. From our review of Ms. Bailey's testimony, no such objection was lodged.[27] As such, this issue is waived. *See State v. Brown*, No. E2015-00899-CCA-R3-CD, 2016 WL 3633474, at *10–*11(Tenn. Crim. App. June 29, 2016), *perm. app. denied* (Tenn. Oct. 20, 2016) (citing Tenn. R. Evid. 103(a)(1)) (holding that a Rule 608(b) objection was waived where the defendant objected to the evidence on another basis but did not raise 608(b) at trial).

## D. Hearsay Statement

Defendants next contend that the trial court should have granted a mistrial based upon the testimony of Ms. Hatfield that the surgeon involved in Mrs. Pierce's care informed her that she "definitely" had a case for a lawsuit. Like the admission of evidence, the decision to grant or deny a mistrial is "a matter resting within the sound discretion of the trial court and will not be reversed absent an abuse of discretion[.]" *State v. Saylor*, 117 S.W.3d 239, 250–51 (Tenn. 2003); *see also Hunter v. Ura*, 163 S.W.3d 686, 699 (Tenn. 2005) (applying the abuse of discretion standard to a mistrial dispute in civil court). "'[T]he burden of establishing the necessity for mistrial lies with the party seeking it.'" *Teague v. Kidd*, No. E2016-01995-COA-R3-CV, 2017 WL 2299059, at *4 (Tenn. Ct. App. May 25, 2017) (quoting *State v. Moss*, No. M2014-00746-CCA-R3-CD, 2016 WL 5253209, at *24 (Tenn. Crim. App. Sept. 21, 2016), *perm. app. denied,* (Tenn. Jan. 19, 2017)).

---

[27] Instead, it appears that Defendants only objected to the relevance of Ms. Bailey's acting experience.

Again, the procedural history relevant to this issue is important to a full understanding of the dispute. During the deposition of Ms. Hatfield, she testified that during an examination of Mrs. Pierce's leg prior to the amputation, Ms. Hatfield asked the surgeon, "Is this a lawsuit?" According to Ms. Hatfield, the physician answered, "Yes." Defendants filed a motion in limine to exclude any mention of this testimony. The motion in limine was taken under advisement pending trial. During trial, however, Ms. Hatfield testified about her conversations with the surgeon. In summation, Plaintiff's counsel asked Ms. Hatfield, if there was "anything else that ya'll discussed besides that and the amputation?" Ms. Hatfield replied that, "I asked him is this a case for a lawsuit, and he said, 'Definitely.'" Defendants immediately objected and asked for a mistrial. Defense counsel later appeared to acquiesce to the trial court giving a curative instruction for the jury to disregard the evidence; another lawyer for Defendants later renewed the motion for a mistrial.

Plaintiff does not assert that the statement by Ms. Hatfield was admissible; rather Plaintiff asserts that Defendants cannot show any prejudice that resulted from the single statement made during the beginning of a five-week trial. We agree. The Tennessee Supreme Court has previously elucidated three factors that may be considered when determining whether a mistrial was warranted because inappropriate testimony was presented to the jury: "(1) whether the [proponent] elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the [proponent's] proof." *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009) (citing *State v. Smith*, 893 S.W.2d 908 (Tenn.1994)). The court noted, however, that there was no mathematical formula in which to precisely determine whether a mistrial should be granted and that other factors could be considered. *Id.* at 547 n.4.

Here, the parties devote considerable attention to whether the statement was unsolicited. To be sure, counsel for Plaintiff did not ask a specific question regarding the surgeon's alleged comment on whether a lawsuit would be viable. However, counsel for Plaintiff was certainly on notice that Ms. Hatfield's discussions with the surgeon included the alleged statement regarding a future lawsuit and had been warned by the trial court not to elicit hearsay from the witnesses. As such, neither party's position is the clear victor.

The other factors, however, more clearly favor Plaintiff in this case. First, there can be no dispute that at the request of counsel for Defendants, a curative instruction was given by the trial court. *Id.* at 547. Generally, the jury is presumed to have followed the trial court's curative instruction. *See State v. Reid*, 164 S.W.3d 286, 342 (Tenn. 2005). In addition, while the proof of negligence in this case was certainly conflicting, Plaintiff presented a competent expert witness who testified that Allenbrooke's negligence caused Mrs. Pierce's injuries and indeed, the jury was well-aware that a lawsuit had resulted. In addition, other factors weigh in favor of finding that this statement was non-prejudicial.

- 36 -

For example, the Tennessee Supreme Court previously held that where a single improper statement was made during the course of a two-week trial, "any prejudicial effect that resulted from the [] comment would have been slight." ***Mercer v. Vanderbilt Univ., Inc.***, 134 S.W.3d 121, 134 (Tenn. 2004) (involving a comment by the trial court). Ms. Hatfield's comment in this case occurred on the first day of testimony in what would be a five-week trial. More than a dozen witnesses testified and over one hundred exhibits were admitted into the record. As such, the prejudicial effect here is no more than what was at issue in ***Mercer***. Given that several factors favor a finding that a mistrial was not warranted, regardless of whether the statement was solicited by Plaintiff's counsel, we cannot conclude that the trial court abused its discretion in failing to grant a mistrial on this basis.

## IV.    Verdict Form

Defendants next contend that the special verdict form used by the trial court was confusing and inconsistent and resulted in an irreconcilable verdict. In support, Defendants note four alleged errors in the jury verdict form: (1) the verdict form failed to instruct the jury as to comparative fault;[28] (2) the verdict form asked the jury to find the Defendants collectively liable before determining whether to pierce the corporate veil; (3) the jury returned a verdict finding Defendants guilty of medical malpractice but awarded no damages for this tort; and (4) the joint and several liability award is at odds with the punitive damages award, which awards damages against each defendant individually.

We begin with Defendants' first two issues, which involve the special verdict form submitted to the jury. As we have previously explained,

> Decisions regarding the use of a special verdict form and the questions to be included on the form are discretionary. *See* Tenn. R. Civ. P. 49; ***Smith v. Parker***, 213 Tenn. 147, 159–60, 373 S.W.2d 205, 211 (1963). When a special verdict form is used, it should repeat and highlight the issues covered in the charge and should be couched in the same terms as the jury instructions. *See* ***Concrete Spaces, Inc. v. Sender***, No. 01A01-9607-CH-00288, 1998 WL 430165, at \*6 (Tenn. Ct. App. July 31, 1998) (Tenn. R.App. P. 11 application pending).[29] Instructions and special verdict forms should be considered together to determine whether they present the contested issues to the jury in an unclouded and fair manner. *See* ***Morton v.***

---

[28] From our review, the jury instructions likewise did not include any specific instructions on comparative fault. No issue has been raised regarding this omission on appeal.

[29] The Tennessee Supreme Court later affirmed the Court of Appeals' decision that the special verdict forms were deficient, but reversed as to the appropriate remedy. *See* ***Concrete Spaces, Inc. v. Sender***, 2 S.W.3d 901, 906 (Tenn. 1999).

*City of Chicago*, 286 Ill.App.3d 444, 222 Ill.Dec. 21, 676 N.E.2d 985, 990 (1997); *Capers v. The Bon Marche*, 91 Wash.App. 138, 955 P.2d 822, 825 (Wash.Ct.App.1998). Reversal is required only when the special verdict form is confusing or inconsistent with the trial court's instructions. *See Helmar v. Harsche*, 296 N.J.Super. 194, 686 A.2d 766, 775 (N.J. Super. Ct. App. Div. 1996).

*Ingram v. Earthman*, 993 S.W.2d 611, 640–41 (Tenn. Ct. App. 1998). When on notice of the contents of a special verdict form, however, the failure to object to the form constitutes a waiver on appeal:

> Counsel should object promptly to a proposed verdict form. If possible, they should object to the form before its submission to the jury. However, if unaware of the form's substance, they should object before the jury returns its verdict. . . . Failure to make a timely objection to a verdict form constitutes a waiver of the objection.

*Creech v. Addington*, 281 S.W.3d 363, 386 (Tenn. 2009) (quoting *Keith v. Murfreesboro Livestock Mkt., Inc.*, 780 S.W.2d 751, 759 (Tenn. Ct. App. 1989) (citations omitted)) ("Although it is the duty of the trial court to provide accurate instructions to the jury, the Plaintiffs, after being made aware of the limitations on the jury's consideration of the evidence prior to closing arguments, neither objected nor made a special request for any alternative directive. The Plaintiffs, therefore, waived appellate consideration of [this issue]."). *But see Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007) (citing Tenn. R. Civ. P. 51.02) (holding that there is no waiver when a party fails to object to an erroneous jury instruction).[30]

Here, Defendants did not object to the special verdict form on the bases that are now raised in this appeal, despite having access to the special verdict form and opportunity to raise objections thereto. Indeed, Defendants did raise certain objections to the form, which included placing the question of negligence before the question of alter ego/joint venture/agency, the very issue they now complain of. At the very least, issues regarding the lack of directions on comparative fault and the order of the special verdict form were known to Defendants prior to the jury rendering its verdict. In fact, it appears that one of the errors alleged by Defendants was actually requested by them. *See* Tenn. R.

---

[30] Specifically, Rule 51.02 provides:

> After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to failure to give a requested instruction, but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial.

Defendants raise this issue with regard to the verdict form, not the instructions given.

App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error[.]"). Finally, we note that neither the placement of the questions on the special verdict form nor the omission of comparative fault appears to have been raised as a ground in Defendants' motion for new trial. *See* Tenn. R. App. P. 3(e). While a party need not always object to erroneous jury instructions to preserve the issue on appeal, the erroneous instruction must be raised as an error in a motion for new trial following the verdict. *Waters*, 229 S.W.3d at 689 (holding that while a party need not always object to jury instructions during trial, the issue must be raised in the motion for new trial). As such, in the absence of both a timely objection to the special verdict form on these bases and an effort to raise these issues as grounds in Defendants' motion for new trial, these arguments are waived.

We concede that Defendants may be correct that the issues regarding irreconcilable jury verdicts may have not been known to Defendant until after the jury rendered its verdict. Unlike the above challenges to the special verdict form, these issues were also raised in Defendant's motion for new trial. *See* Tenn. R. App. P. 3(e). We cannot agree, however, that these issues constitute errors sufficient to necessitate a new trial.

It is true that an irreconcilable verdict cannot stand. *See, e.g., **Milliken v. Smith**, 218 Tenn. 665, 668, 405 S.W.2d 475, 476 (Tenn. 1966) ("The general rule is that verdicts which are inconsistent and irreconcilable must not be allowed to stand."). In one case cited by Defendants, this Court held that a jury verdict that found the defendant had injured the plaintiff but awarded no damages was "erroneous on its face." ***Clements v. Veterans Cab Co.***, 48 Tenn. App. 152, 161, 344 S.W.2d 572, 576 (Tenn. 1960). We note, however, that "[i]t is the duty of the court in construing verdicts to give them the most favorable interpretation and to give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict." ***Briscoe v. Allison***, 200 Tenn. 115, 125–26, 290 S.W.2d 864, 868 (Tenn. 1956)). In reviewing the jury's verdict, we must therefore "place a construction there on that will uphold the verdict[.]" ***Newsom v. Markus***, 588 S.W.2d 883, 886 (Tenn. Ct. App. 1979) (quoting ***Briscoe***, 290 S.W.2d at 868) ("If, after an examination of the terms of the verdicts, the court is able to place a construction there on that will uphold the verdict, it is incumbent upon the court to do so.").

Reviewing the jury's verdict in the light most favorable to it, we cannot conclude that the verdict is irreconcilable, either because of the lack of damages for medical malpractice or the finding of joint and several liability that is purportedly at odds with the later punitive damages award. First, we note that although verdicts in which liability is found but no damages are awarded are unusual and disfavored, we have previously recognized that "[a] jury verdict reflecting zero damages where negligence has been determined in favor of the plaintiff, either by summary judgment, directed verdict, or a one-hundred-percent defendant fault finding, has been upheld in a number of cases

reported in Tennessee and in sister jurisdictions." ***Dixon v. Cobb***, No. M2006-00850-COA-R3-CV, 2007 WL 2089748, at *5 (Tenn. Ct. App. July 12, 2007) (citing ***McDonald v. Petree***, 409 F.3d 724, 731 (6th Cir. 2005); ***Blosfeld v. Hall***, 511 S.E.2d 196, 199 (Ga. Ct. App. 1999); ***Pearson v. Wasell***, 723 N.E.2d 609, 616–17 (Ohio Ct. App. 1998); ***Newsom***, 588 S.W.2d at 887). Moreover, the jury's verdict is not erroneous on its face because it complies with the instructions therein. Specifically, the special verdict form provides that "if you award damages for injuries sustained by Mrs. Pierce as a result of Negligence, you must not award damages for those same injures as a result of Medical Malpractice."[31] The jury awarded damages as a result of ordinary negligence. In failing to award any damages as a result of medical malpractice, it therefore appears that the jury followed the instructions of the jury form. Consequently, we cannot conclude that the jury verdict is erroneous on its face based on this irregularity. *See **Clements,*** 344 S.W.2d at 576; ***Newsom v. Markus***, 588 S.W.2d at 886.

We also agree with Plaintiff that the issues of compensatory damages and punitive damages involve divergent focuses; indeed, Defendants have cited no law in support of their theory that it is inconsistent to hold multiple defendants liable collectively for acting in concert for purposes of compensatory damages while placing differing amounts of culpability on each defendant during the punitive damages phase.[32] Indeed, while the issue of compensatory damages is determined by the amount of Mrs. Pierce's injuries, an amount that remains static as to each defendant held jointly and severally liable, punitive damages are based on other factors, including the defendant's conduct and financial status, which can change from defendant to defendant. *See **Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 (Tenn. 1992) (discussing the factors applicable in determining punitive damages). As such, viewing the jury verdict in the light most favorable to it, we cannot conclude that this constitutes an error that necessitates a new trial.

## V.     Liability of non-Allenbrooke Defendants

The non-Allenbrooke Defendants next argue that (1) the trial court failed to grant their requested directed verdict on the issue of their individual liability; and (2) the jury erred in finding material evidence to hold them individually liable for the alleged negligence of Allenbrooke. In resolving these issues, we must first discuss the applicable standards of review. As an initial matter, we note that following the denial of Defendants' motion for directed verdict at the close of Plaintiff's proof, Defendants chose to present their own evidence. As such, consideration of the trial court's initial decision to deny the motion for directed verdict is waived. *See **Searle v. Bryant***, 713 S.W.2d 62, 66 (Tenn.

---

[31] Defendants do not appear to have objected to this particular instruction either at trial or on appeal.

[32] Moreover, issues relating to the damages awarded against the individual defendants for acting in concert compared to how the jury awarded punitive damages are largely rendered moot by our decision to vacate the amount of punitive damages awarded in this case, as well as our decision regarding the liability of a majority of the non-Allenbrooke Defendants.

1986) (citing ***Nashville Ry. & Light Co. v. Henderson***, 118 Tenn. 284, 99 S.W. 700, 700 (Tenn. 1907) ("It not infrequently happens that the defendant himself by his own evidence supplies the missing link [requiring denial of a motion for a directed verdict].")) ("It is well-settled that a defendant waives his right to rely on error in the denial of his motion for directed verdict made at the end of the plaintiff's proof if he goes forward with his own proof rather than resting on the motion."); *see also* ***Hand v. Norfolk S. Ry. Co.***, No. 03A01-9704-CV-00123, 1998 WL 281946, at *1 (Tenn. Ct. App. June 2, 1998) ("[I]ntroduction of evidence by the Defendant waived the motion for directed verdict made at the conclusion of the Plaintiff's proof."); Robert J. Banks, June F. Entman, *Tennessee Civil Procedure* § 10-9(b) (4th ed. 2015) (citing ***James v. Swindell***, No. E1999-02407-COA-R3-CV, 2000 WL 1195683, at *3 (Tenn. Ct. App. Aug. 23, 2000)) ("A defendant does waive its right to rely on the error of the trial judge in the denial of its motion for directed verdict made at the close of the plaintiff's proof if it goes forward with its own proof rather than resting on the motion.").

Defendants did properly renew the motion following the close of all proof and by filing a post-trial motion for judgment notwithstanding the verdict. We review the denial of Defendant's motion for judgment notwithstanding the verdict as follows:

> In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. ***Sauls v. Evans***, 635 S.W.2d 377 (Tenn.1982); ***Holmes v. Wilson***, 551 S.W.2d 682 (Tenn.1977). If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. ***Crosslin v. Alsup***, 594 S.W.2d 379 (Tenn. 1980).

***Eaton v. McLain***, 891 S.W.2d 587, 590 (Tenn. 1994) (noting that the standard for reviewing a motion for a directed verdict is the same); *cf.* ***Baggett v. Louisville & N. R. Co.***, 51 Tenn. App. 175, 185, 365 S.W.2d 902, 906 (Tenn. Ct. App. 1962) (holding that in reviewing a motion for a directed verdict, the court may consider all the proof presented to the jury, including the proof presented by the defense); *see also* ***Potter v. Tucker***, 688 S.W.2d 833, 835 (Tenn. Ct. App. 1985) (holding that in an appeal from the denial of a motion for directed verdict, the court should consider "all of the evidence" or "the whole evidence").

Likewise, we review the sufficiency of the evidence to sustain the jury's verdict as follows:

In reviewing the sufficiency of a civil jury verdict, we will set aside findings of fact by a jury "only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d); *see also* **Wilson v. Americare Sys., Inc.**, 397 S.W.3d 552, 558 (Tenn. 2013). To determine whether there is such material evidence, we "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." **Creech v. Addington**, 281 S.W.3d 363, 372 (Tenn. 2009) (alteration in original) (quoting **Barnes v. Goodyear Tire & Rubber Co.**, 48 S.W.3d 698, 704 (Tenn. 2000) (internal quotation marks omitted)), *abrogated by* **Gossett v. Tractor Supply Co.**, 320 S.W.3d 777 (Tenn. 2010). We do not re-weigh the evidence, **Flax v. DaimlerChrysler Corp.**, 272 S.W.3d 521, 532 (Tenn. 2008), and do not recalibrate the jury's preponderance of the evidence assessment, **Barnes**, 48 S.W.3d at 704. The credibility of witnesses is the province of the jury, not appellate courts. *See, e.g.,* **State v. Flake**, 88 S.W.3d 540, 554 (Tenn. 2002) ("Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations."); **Reynolds v. Ozark Motor Lines, Inc.**, 887 S.W.2d 822, 823 (Tenn. 1994).

**Ferguson v. Middle Tennessee State Univ.**, 451 S.W.3d 375, 380 (Tenn. 2014). In performing this analysis, we consider only the evidence presented during the compensatory damages phase of trial, as it was following this phase of trial that the jury made its decision to hold the non-Allenbrooke Defendants liable. *See* **State v. Williams**, No. W2001-02606-CCA-R3-CD, 2002 WL 31259499, at *6 (Tenn. Crim. App. Sept. 18, 2002) (citing **State v. Longstreet**, 619 S.W.2d 97, 100-01 (Tenn. 1981), *overruled in part on other grounds by* **State v. Leveye**, 796 S.W.2d 948, 953 (Tenn. 1990)) ("Whether the evidence at trial is legally sufficient to support the verdict is examined in light of the evidence actually presented to the jury."). Thus, our review of either the judgment notwithstanding the verdict or sufficiency of the evidence issues generally involve whether, after reviewing all of the evidence, there was material evidence presented for the jury to impose liability on the non-Allenbrooke Defendants.

We begin our discussion of the applicable law and facts regarding the entities at issue in this case. Here, Defendants do not appear to dispute that, setting aside the procedural issues discussed above, the jury had sufficient evidence to find that Allenbrooke, a Tennessee limited liability company that operated the nursing facility in Tennessee, committed negligence and medical malpractice in this case. The dispute in this case involves whether the non-Allenbrooke Defendants, that is Aurora Cares, DTD,

D&N, Mr. Denz, and Mr. Bennett, may likewise be liable in this case.[33] The relationships between the parties are somewhat convoluted, so some explanation is again helpful.

D&N and DTD are limited liability companies organized under the laws of New York; each entity maintains a fifty percent membership interest in Allenbrooke, a Tennessee limited liability company. D&N and DTD likewise maintain equal membership in Aurora Cares, another limited liability company organized under New York law. Aurora Cares provides administrative support services to nursing homes, including Allenbrooke. There is no dispute that neither D&N nor DTD have employees or agents. The majority and sole voting member of D&N is Mr. Bennett, who also serves as D&N's company manager. Mr. Bennett is also a limited liability company manager for Aurora Cares and Allenbrooke, and serves as the co-Chief Executive Officer of Aurora Cares. Mr. Bennett served as the co-Chief Executive Officer of Allenbrooke until December 2008. The majority and sole voting member of DTD is Mr. Denz, who likewise serves as that company's manager. Mr. Denz is a limited liability company manager for Aurora Cares and Allenbrooke. Mr. Denz also served as the co-Chief Executive Officer and Chief Financial Officer of Allenbrooke until December 2008.

In general, "a limited liability company exists separate and apart from its members" in the same way that a corporation is separate from its shareholders. *Johnson v. Tanner-Peck, L.L.C.*, No. W2009-02454-COA-R3-CV, 2011 WL 1330777, at *13 (Tenn. Ct. App. Apr. 8, 2011) (applying rules regarding corporate separateness to a limited liability corporation). Specifically, Tennessee Code Annotated section 48-217-101 provides that "a member, holder of financial interest, governor, manager, employee or other agent of an LLC does not have any personal obligation and is not otherwise personally liable for the acts, debts, liabilities, or obligations of the LLC whether such arise in contract, tort or otherwise." Tenn. Code Ann. § 48-217-101 (a)(1). One caveat to this rule, however, is that "a member, holder of financial interest, governor, manager, employee or other agent may become personally liable in contract, tort or otherwise by reason of such person's own acts or conduct." Tenn. Code Ann. § 48-217-101(a)(3). Additionally, this Court has previously held that the equitable doctrine of piercing the corporate veil is equally applicable to limited liability corporations. *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 828 (Tenn. Ct. App. 2012) (quoting *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991) ("The doctrine of piercing the corporate veil applies equally to cases in which a party seeks to pierce the veil of a limited liability company."). Thus, there are two theories of liability at issue: (1) direct liability against the non-Allenbrooke Defendants for their own role in the torts of negligence and medical malpractice, as well as violations of TAPA, as found by the jury;

---

[33] We note that Tennessee Code Annotated section 29-26-102(a) provides that "[a] passive investor shall not be liable" in a healthcare liability action. The statute goes on to provide an exception. Because section 29-26-102 did not become effective until 2015, however, neither party alleges that it is applicable in this case. *See* 2015 Tenn. Laws Pub. Ch. 254 (H.B. 1285), eff. April 24, 2015.

and (2) vicarious liability against the non-Allenbrooke Defendants under the theories of alter ego/joint venture/agency.[34] We begin with Plaintiff's theory of direct liability.

## A. Direct Liability

As previously discussed, there is no dispute that the non-Allenbrooke Defendants may be liable for their "own acts or conduct" that constitutes negligence and/or medical malpractice in this case. Tenn. Code Ann. § 48-217-101(a)(3). Here, the tortious conduct at issue involves understaffing and negligence by Allenbrooke against Mrs. Pierce. The non-Allenbrooke Defendants argue, however, that the jury lacked evidence to find that they may be directly liable for the torts at issue in this case because there was no evidence that they were involved in Mrs. Pierce's care.

Here, both parties appear to agree that in order to be directly liable under this theory, each non-Allenbrooke Defendant must have been involved in the day-to-day operations of the facility.[35] The parties appear to disagree, however, as to whether the level of involvement shown in this case was sufficient to meet this test. Plaintiff asserts that because the non-Allenbrooke Defendants were involved in the budget and staffing levels of the facility, they can be directly liable for the injuries that resulted to Mrs. Pierce. *See* 5 Mark R. Kosieradski & Joel E. Smith, *Litigating Tort Cases* § 63.45 (2017) (citing ***United States v. Bestfoods***, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998)) ("In the nursing home context, . . . the parent's control of the day-to-day operation of the facility, as opposed to operation of the subsidiary, will create direct liability."). We cannot agree that mere involvement in financial decisions is always sufficient to impose direct liability. Rather, the United States Supreme Court has explained the following nuanced approach to this question:

> [T]he acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior . . . are crucial reference points. Just as we may look to

---

[34] We note that DTD and D&N are not Tennessee limited liability companies, but rather are organized under the laws of New York. New York law similarly provides for liability against limited liability companies for direct negligence and in the case of sham/dummy companies. *See* NY Limit Liab Co § 609(a) (providing that members and others associated with a limited liability company are not liable for the liabilities of the company); ***Bd. of Managers of Beacon Tower Condo. v. 85 Adams St., LLC***, 136 A.D.3d 680, 681–82, 25 N.Y.S.3d 233, 237 (N.Y. App. Div. 2016) ("[M]embers of limited liability companies, such as corporate officers, may be held personally liable if they participate in the commission of a tort in furtherance of company business. . . . [A] party may seek to hold a member of an LLC individually liable despite this statutory proscription by application of the doctrine of piercing the corporate veil.") (citations omitted). In this appeal, the parties solely discuss Tennessee law. As such, we likewise apply the law of Tennessee, where available.

[35] Thus, we focus on the non-Allenbrooke Defendants' involvement with Allenbrooke, rather than their involvement with the other non-Allenbrooke entities.

such norms in identifying the limits of the presumption that a dual officeholder acts in his ostensible capacity, so here we may refer to them in distinguishing a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." [Lynda J. Oswald, *Bifurcation of the Owner and Operator Analysis Under CERCLA: Finding Order in the Chaos of Pervasive Control*, 72 Wash. U. L.Q. 223, 280 (1994))]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

\* \* \*

[O]perator liability can only be evidenced by extensive parental involvement in, and control over, the facility; the parent's involvement in the activities of the subsidiary itself are not important. Factors that tend to support piercing, such as common directors or inadequate capitalization, but that are unrelated to the operation of the facility, should not give rise to liability. Likewise, activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability of the parent. Rather, operator liability should flow from the parent's active management of the facility as evidenced by its involvement in day-to-day operations of the facility.

**Bestfoods**, 524 U.S. at 71–72 (citation omitted); *see also* **Gordon v. Greenview Hosp., Inc.**, 300 S.W.3d 635, 651 (Tenn. 2009) (citing **Bestfoods** favorably).[36] Thus, direct liability will generally not attach where the parent's actions are typical of parental oversight of a subsidiary's facility.

We cannot agree that the jury had material evidence to find direct liability against Mr. Denz, Mr. Bennett, DTD, or D&N in this case. To be sure, the corporate documents at issue indicate that Mr. Denz and Mr. Bennett have "complete, full, exclusive discretion, power, and authority" in the management of Allenbrooke and their respective

---

[36] Both parties cite the **Bestfoods** analysis in determining direct liability in this case. As such, we likewise apply the test articulated therein.

- 45 -

holding companies. In addition, tax returns show that Mr. Denz and Mr. Bennett each devoted a small percentage of their week to work associated with Allenbrooke during the time frame of Mrs. Pierce's injury, while the testimony indicated that each individual defendant made a handful of trips to Allenbrooke per year as part of the administrative services that were provided to Allenbrooke. The "'exercise of control'" by stockholders, however, "'will not create liability beyond the assets of the subsidiary.'" **Bestfoods**, 524 U.S. at 61–62 (quoting Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 196 (1929) ("That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.")). As previously discussed, the non-Allenbrooke Defendants must take some actions beyond the typical action authorized by their investor status to be directly liable for the torts at issue here. *See **id.*** at 71 (noting that "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct liability"). Likewise, the fact that Mr. Denz and Mr. Bennett installed themselves as members and managers in the various companies at issue in this case is not sufficient to impose direct liability. ***Id.*** (quoting Douglas, 39 Yale L.J. at 196 ("Nor will a duplication of some or all of the directors or executive officers be fatal.")). Nor is the fact that Mr. Benz and Mr. Bennett sat on Allenbrooke's governing board, which was charged with establishing and implementing policies for the facility, alone sufficient to impose direct liability, in the absence of evidence that they were controlling or central figures in the day-to-day operations of the facility. *See **id.*** at 70–71 (quoting ***American Protein Corp. v. AB Volvo***, 844 F.2d 56, 57 (C.A.2), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988)) ("'[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.' . . . [I]t cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility.").

Rather, the jury must have had material evidence to find that Mr. Denz, Mr. Bennett, DTD, or D&N were actively involved in the operations of Allenbrooke with regard to the specific transaction at issue. *See **Forsythe v. Clark USA, Inc.***, 224 Ill. 2d 274, 283–84, 864 N.E.2d 227, 234 (Ill. 2007) (citing ***Esmark, Inc. v. National Labor Relations Board***, 887 F.2d 739, 757 (7th Cir. 1989)) ("[A] parent corporation could be held liable for the actions of its subsidiaries if the parent directly supervised the conduct of a specific transaction."). The evidence presented, however, did not show that Mr. Denz, Mr. Bennett, DTD, or D&N participated in the *day-to-day* operations of Allenbrooke to an extent sufficient to impose direct liability. *See **Bestfoods***, 524 U.S. at 71–72 (requiring that the involvement be extensive). Importantly, Mr. Bennett, Mr. Denz, and Administrator Meadows all testified that the non-Allenbrooke Defendants, particularly Mr. Denz and Mr. Bennett, were simply not involved in the staffing and operation of the facility. No other witnesses were able to contradict this testimony with

personal knowledge that Mr. Bennett or Mr. Denz ever interfered or exercised extensive parental involvement in Allenbrooke's staffing or care decisions.

There can be no dispute, however, that Mr. Denz and Mr. Bennett were involved in some of the financial dealings of Allenbrooke and that money from Allenbrooke flowed to other entities associated with Mr. Denz and Mr. Bennett, ultimately resulting in income to the individual defendants. Specifically, Plaintiff cites the decision to create a quality bonus system that appears to incentivize cost-cutting.[37] According to Plaintiff, this involvement in the financial matters of Allenbrooke resulted in the understaffing that the jury found caused Mrs. Pierce's injury. As an initial matter, we note that "mere budgetary mismanagement is not enough to support direct participant liability[,]" unless coupled with "the direction or authorization of the manner in which an activity is undertaken." *Forsythe*, 864 N.E.2d at 237 ("In other words, these courts found that a viable claim of liability under the direct participant theory cannot rest solely upon budgetary mismanagement, but budgetary mismanagement can make up one part of a viable claim, in conjunction with the direction or authorization of the manner in which an activity is undertaken"). Nothing in the bonus offer specifically states that in order to be awarded the bonus, Allenbrooke should cut staffing or in any way infringe on patient care. Indeed, the bonus program was tied not only to budgetary issues, but generally also required satisfactory levels of care to be awarded. As such, Administrator Meadows testified that he did not feel incentivized to cut costs by the bonus program.

Additionally,

'[W]here the parent specifically directs the actions of its subsidiary, using its ownership interest to command rather than merely cajole,' the possibility of direct liability is present and will be imposed 'where a parent disregards the separate legal personality of its subsidiary (and the subsidiary's own decisionmaking 'paraphernalia'), and exercises direct control over a specific transaction.'

*Id.* at 234–35 (quoting *Esmark*, 887 F.2d at 757). The undisputed evidence in the record, however, was that the bonus system was not mandatory, but was merely a recommendation to the facility. Thus, given the other testimony in the record that Mr. Denz, Mr. Bennett, DTD, or D&N were not involved in day-to-day operations of the facility, particularly with regard to staffing, we cannot conclude that this bonus offer constitutes material evidence of direct intervention by Mr. Denz, Mr. Bennett, DTD, or D&N to impose direct liability in this case.

---

[37] Specifically, the bonus system would provide a bonus to the facility administrator, Assistant Executive Director, and the Director of Nursing if two criteria were met: (1) the facility met its net income goal; and (2) the facility was not found to be deficient to a certain level during a state survey. The administrator was also eligible for other bonuses related to accounts receivable, as well as revenue and survey results.

Plaintiff argues, however, that a number of cost reports created on behalf of Allenbrooke from 2004 to 2008 indicate that Mr. Bennett was directly involved in patient care, stating that his responsibilities included "oversight of resident care issues."[38] Even disregarding the countervailing evidence that this statement was inaccurate, as we must when reviewing a jury verdict, we cannot conclude that this provides material evidence in support of direct liability. *See Ferguson*, 451 S.W.3d at 380 (outlining the standard of review in appeals from jury verdicts). Here, the single statement contained in the cost reports does not indicate that Mr. Bennett exercised direct control or extensive involvement over the staffing levels of Allenbrooke, nor does it state that Mr. Bennett was in any way involved in Mrs. Pierce's care. *See Esmark*, 887 F.2d at 757 (requiring that the parent "exercise[] direct control over a specific transaction"); *United States v. Sutton*, 795 F.2d 1040, 1060 (Temp. Emer. Ct. App. 1986) ("A shareholder may be liable if he is a 'central figure' in a corporation's tortious conduct."). Indeed, the final cost report involved the year 2008; Mrs. Pierce's injury occurred following her May 2009 stroke. As such, this cost report is not material evidence to support a finding of direct liability against Mr. Bennett.

Here, the specific transaction at issue is the tortious conduct by Allenbrooke that resulted in Mrs. Pierce's injuries. As such, direct liability may result only where material evidence is presented of "active management of the facility [by Mr. Denz, Mr. Bennett, DTD, or D&N] as evidenced by [their] involvement in day-to-day operations of the facility." *Bestfoods*, 524 U.S. at 72. The only evidence in the record regarding the involvement of Mr. Denz, Mr. Bennett, DTD, or D&N in Allenbrooke shows that their actions were consistent with their investor status. *Id.* at 71. Based on the foregoing and our review of the voluminous evidence in this case, we must conclude that Plaintiff failed to present material evidence in support of its theory that there was "extensive parental involvement in, and control over, the facility" sufficient to subject Mr. Denz, Mr. Bennett, DTD, or D&N to direct liability. *Id.* The jury's verdict on this issue, therefore, cannot stand.

The same, however, cannot be said for Aurora Cares. Here, unlike with regard to Mr. Denz, Mr. Bennett, DTD, or D&N, there is material evidence in the record to support a finding that Aurora Cares participated in the care provided to residents at Allenbrooke and thus, the specific transaction at issue.[39] *See id.* The non-Allenbrooke Defendants paint Aurora Cares as merely an administrative management company, providing payroll services and the like to Allenbrooke and other facilities, without any involvement in the

---

[38] Plaintiff also cites a 2003 cost report stating that Mr. Bennett has "daily" contact with Allenbrooke. This cost report is not relevant to the time frame of Mrs. Pierce's injuries, which occurred half a decade later.

[39] We note that unlike DTD and D&N, Aurora Cares is not the parent company of Allenbrooke. It is, however, highly related to Allenbrooke through mutual ownership and duplication of officers and members.

actual operation of the facility. Indeed, the administrative services agreement between Allenbrooke and Aurora Cares explicitly provides that Allenbrooke retains full power over staffing issues. Likewise, Aurora Cares' president during the relevant time, Chance Becnel, testified that only the administrator of Allenbrooke was charged with the responsibility of overseeing issues related to overstaffing and patient care, while Aurora Cares' work with Allenbrooke was "financial in nature." Again, involvement in the finances of Allenbrooke alone is insufficient to show direct liability without evidence that Aurora Cares directed the day-to-day operations of Allenbrooke. *See id.* at 72.

The evidence, however, reveals involvement beyond the financial, specifically that Aurora Cares held meetings on an annual or semi-annual basis to provide recommendations to facilities regarding the care provided by Allenbrooke. These recommendations were not merely financial, as "clinical people" were also involved. Again, mere recommendations are generally not enough to impose direct liability. *See Forsythe*, 864 N.E.2d at 234–35. The operating agreement between Aurora Cares and Allenbrooke, however, also provides that Aurora Cares was tasked with "establish[ing] employee performance standards as needed . . . to ensure the efficient operation of all departments within and services offered" by Allenbrooke. In this vein, Aurora Cares evaluates the performance of Allenbrooke's administrator to determine if he is eligible for a bonus under the bonus structure explained above.

In performing its contracted duty to Allenbrooke regarding employee performance standards, the evidence also shows that Aurora Cares employed registered nurses who would facilitate mock surveys at the facilities "to point out where perhaps [the facility] could improve or make improvements." This resource provided to facilities included both "human resource people" and "dietary people" to ensure that the facility was operating in compliance with legal guidelines. The purpose of the mock survey is to "look at care" to ensure that the facility is "providing the best care that they can and that [Aurora] Cares can assist them in pointing out where they may be doing things differently or consistent." The above involvement is therefore not merely financial, but also concerns the operations of the facility, suggesting that Aurora Cares "'directed and authorized the manner' in which the subsidiary conducted its business." *Forsythe*, 864 N.E.2d at 237 (quoting *Waste Mgmt., Inc. v. Superior Court*, 119 Cal. App. 4th 105, 112, 13 Cal. Rptr. 3d 910, 915 (Cal. Ct. App. 2004)). We agree that this evidence is not substantial, particularly given the other testimony in the record regarding the lack of participation by Aurora Cares in Allenbrooke's staffing decisions. However, in this appeal from a jury verdict, we must affirm the jury's verdict if the record contains any material evidence to support it. *See Ferguson*, 451 S.W.3d at 380. Likewise, we affirm the trial court's denial of the motion for judgment notwithstanding the verdict if there is any doubt of the conclusions to be drawn from the evidence. *See Eaton*, 891 S.W.2d at 590. In a similar case involving an appeal from the denial of a directed verdict, this Court held that evidence that a management company conducted "training programs" at the subject nursing home and regulated certain activities at the facility including both staffing and management of risks

and safety, was sufficient evidence to allow the issue to be submitted to a jury. ***Smartt v. NHC Healthcare/McMinnville, LLC***, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *7 (Tenn. Ct. App. Feb. 24, 2009) (considering other facts in addition to those listed). Given the narrow standard of review applicable in this case, we are constrained to affirm the jury's finding that Aurora Cares was indeed an integral figure in the care that was provided by Allenbrooke. As such, the finding of joint and several liability against Aurora Cares for negligence, medical malpractice, and violations of TAPA must be affirmed.[40] *See **Resolution Tr. Corp. v. Block***, 924 S.W.2d 354, 357 (Tenn. 1996) (quoting 3 Fletcher Cyclopedia of the Law of Private Corporations § 1002 (1990 Rev. Ed.)) ("'Liability is joint and several where two or more directors participate in the wrongful acts.'"); *see also* Tenn. Code Ann. § 71-6-102 (defining a "caretaker" who may be liable under TAPA as "an individual or institution who has assumed the duty to provide for the care of the adult by contract or agreement").

## B. Vicarious Liability

Mr. Denz, Mr. Bennett, DTD, and D&N next argue that the jury erred in holding them vicariously liable for the torts of Allenbrooke.[41] Here, Plaintiff advanced three theories of vicarious liability against the non-Allenbrooke Defendants in their complaint: (1) alter ego; (2) agency; and (3) joint enterprise. The jury found the non-Allenbrooke Defendants liable under all three theories. On appeal, Plaintiff takes issue with the non-Allenbrooke Defendants' decision to focus largely on the alter ego theory rather than the other theories asserted in this case. As such, Plaintiff asserts that we should affirm the jury's decision in the absence of a proper argument as to these additional theories. *See **Duckworth Pathology Grp., Inc. v. Reg'l Med. Ctr. at Memphis***, No. W2012-02607-COA-R3-CV, 2014 WL 1514602, at *11 (Tenn. Ct. App. Apr. 17, 2014) (holding that this court must affirm where the appellant fails to challenge all of the alternative grounds

---

[40] Although Defendants raised the issue of the failure to include instructions on the special verdict form concerning comparative fault in this appeal, at no point do Defendants actually argue that, if the jury's verdict against Aurora Cares is affirmed on the basis of direct liability, the damages awarded should not be joint and several. Rather, in the section of their brief devoted to issues involving the special verdict form, Defendants merely contend that joint and several liability was not appropriate in this case under Tennessee Code Annotated section 29-11-107, which provides certain rules purporting to limit the applicability of joint and several liability. As previously discussed, however, Defendants have waived any purported error regarding failure to include specific directions regarding comparative fault in the special verdict form. Moreover, section 29-11-107 applies only to claims that accrued on or after July 1, 2013. *See* Tenn. Laws Pub. Ch. 317 (S.B. 56) ("This act shall take effect July 1, 2013, . . . and shall apply to all actions accruing on or after that date."). The claims in this case accrued well before 2013; as such, this statute is simply inapplicable. We therefore will not tax the length of this already lengthy opinion by addressing an argument not specifically and expressly raised by Defendants in their brief to this Court. The award of compensatory damages jointly and severally between Allenbrooke and Aurora Cares will therefore not be disturbed.

[41] We focus only on Mr. Denz, Mr. Bennett, DTD, and D&N, as direct liability has been established against Aurora Cares, *supra*.

supporting a decision on appeal). We decline to conclude that these issues are waived. *Cf. **Wells ex rel. Baker v. State***, 435 S.W.3d 734, 756 (Tenn. Ct. App. 2013) (noting that the defendant largely failed to address an agency issue in its brief, but had sufficiently addressed the issue by arguing that the two entities were not alter egos). We conclude, however, none of the three theories espoused provides a basis for liability in this case.

## A. Agency

We begin with agency. First, we note that the Tennessee Supreme Court has held that in this context agency is merely one of many theories advanced "to disregard corporate entities and hold one corporation liable for the debts of another[.]" ***Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo***, 578 S.W.2d 625, 631 (Tenn. 1979). In ***Continental Bankers***, the Tennessee Supreme Court ultimately discarded these theories in favor of a unified theory meant to determine whether a parent corporation was the alter ego of the subsidiary. ***Id.*** In ***Gordon v. Greenview Hosp., Inc.***, 300 S.W.3d 635 (Tenn. 2009), however, the Tennessee Supreme Court appeared to hold that agency provides a separate theory from alter ego in the context of determining whether personal jurisdiction exists "over a subsidiary corporation based on the actions of the parent corporation[.]" ***Id.*** at 653. The Court noted, however, that both the agency test and the alter ego test involve the question of "whether the parent corporation 'so dominated the [subsidiary] corporation as to negate its separate personality.'" ***Id.*** 653 & n.14 (quoting ***Material Supply Int'l, Inc. v. Sunmatch Indus. Co.***, 62 F.Supp.2d 13, 20 (D.D.C. 1999)) ("The analysis hinges on the right to control the agent's actions, . . . and, ultimately, the fact of actual control over the agent.") ***Id.*** at 653. As such, our supreme court held that "an alter ego or agency relationship is typified by the parent corporation's control of the subsidiary corporation's internal affairs or daily operations." ***Id.*** at 652 (citing ***Doe v. Unocal Corp.***, 248 F.3d 915, 926 (9th Cir. 2001)).

We have previously held that there was no evidence in the record to find that Mr. Denz, Mr. Bennett, DTD, and D&N were involved in the "daily operations" of Allenbrooke. Moreover, questions involving domination and control appear to be required elements in seeking to disregard corporate separateness, either through the theory of agency or through an alter ego theory applicable in the parent-subsidiary context. It appears that an agency theory has therefore been somewhat subsumed by the alter ego theory for disregarding corporate separateness. *See **id.*** (citing ***Quarles v. Fuqua Indus., Inc.***, 504 F.2d 1358, 1364 (10th Cir. 1974) (discussing both agency and alter ego theories and stating that "the presumption of corporate separateness in the absence of evidence of the parent corporation's domination of the day-to-day business decisions of the subsidiary corporation"). Given these overlapping elements, we will address agency in the context of Plaintiff's alter ego argument, *infra*.

## B. Joint Venture

We likewise conclude that joint venture theory is not a method of avoiding the veil piercing analysis set forth by our supreme court. According to this court,

> A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term. . . .

*Via v. Oehlert*, 347 S.W.3d 224, 230 (Tenn. Ct. App. 2010) (quoting *Robertson v. Lyons*, 553 S.W.2d 754, 757 (Tenn. Ct. App. 1977)). Thus, where a legal partnership or corporation has been created, the rules regarding joint ventures are inapplicable. *See Robertson*, 553 S.W.2d at 757 (quoting *Spencer Kellogg & Sons, Inc. v. Lobban*, 204 Tenn. 79, 92, 315 S.W.2d 514, 520 (Tenn. 1958)) (noting that a joint venture exists when no legal partnership or *corporation* has been formed); *see also In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 887 F. Supp. 1455, 1462 (N.D. Ala. 1995) ("[T]he fact that an entity is a corporation precludes a finding that it is a partnership or a joint venture or a finding that its stockholders constitute partners or joint venturers. . . . A joint venture cannot, however, be carried on in corporate form because the two forms of business are mutually exclusive."); *Zwicki v. Superior Mach. Co. of S.C.*, 2002 WL 34365098, at *8 (D.Minn. 2002) ("Under Minnesota law, plaintiffs may not use theories of joint venture or joint enterprise to attribute a corporation's liability to its shareholders or its parent corporation.").

We concede that this case does not involve a legal partnership or corporation. Under Tennessee law, however, the limited liability company entity is "a hybrid of partnerships and corporations." *State v. Thompson*, 197 S.W.3d 685, 692 (Tenn. 2006) (citing Tenn. Code Ann. § 48-201-101, *et seq.*); *see also Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 200 (Tenn. Ct. App. 2009) (quoting 83 Am.Jur.2d *Limited Liability Companies* § 1) ("'[A] limited liability company is a form of legal entity that has the attributes of both a corporation and a partnership but is not formally characterized as either one.'"). As such, the basic tenet that joint venture theory is inapplicable to impose liability on a corporate shareholder or parent company should apply equally in the case of efforts to reach the investors or members of a limited liability company. Indeed, Tennessee law clearly provides that members, agents, and holders of financial interests in limited liability companies are not to be held liable for the liabilities of the limited liability company except when liable for their own misconduct, *see* Tenn. Code Ann. 48-217-101, or when the corporate veil is pierced. *See Edmunds*, 403 S.W.3d at 828. We cannot conclude that section 48-217-101 authorizes personal liability outside of these two narrow circumstances. As such, joint venture is not an appropriate theory of

recovery against Mr. Denz, Mr. Bennett, DTD, or D&N in this case.[42] The jury's verdict imposing liability on these parties under a joint venture theory is therefore reversed.

## C. Alter Ego

We therefore proceed to discuss the remaining theory for vicarious liability in this case: alter ego. As previously discussed, there is a presumption that a limited liability corporation is separate and apart from its members and parent entities. *See Boles v. Nat'l Dev. Co.*, 175 S.W.3d 226, 244 (Tenn. Ct. App. 2005) (quoting *VP Buildings, Inc. v. Polygon Group*, No. M2001-00613-COA-R3-CV, 2002 WL 15634, *4–5 (Tenn. Ct. App. Jan. 8, 2002)) ("'There is a presumption that a corporation is a distinct legal entity, wholly separate and apart from its shareholders, officers, directors, or affiliated corporations.'"); *see also Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 827 (Tenn. Ct. App. 2012) (applying this rule to limited liability corporations). The Tennessee Supreme Court discussed the alter ego theory for disregarding corporate separateness in *Gordon v. Greenview Hospital, Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009). In the context of a challenge to the court's personal jurisdiction, the court explained:

> Determining whether one corporation is an alter ego of another for jurisdictional purposes is controlled by state law. *Jemez Agency, Inc. v. CIGNA Corp.*, 866 F.Supp. 1340, 1343 (D.N.M. 1994). In Tennessee, mere control of a subsidiary corporation by its parent is not sufficient to disregard the presumption of corporate separateness (to "pierce the corporate veil"). *Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 790 (Tenn. 2006); *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 631 (Tenn. 1979). To disregard the presumption, the party seeking to do so must demonstrate (1) that the subsidiary corporation is a sham or dummy, *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985), (2) that the two corporations are, in fact, identical and indistinguishable, *Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d [846,] 866 [(Tenn. Ct. App. 2000)], or (3) that the subsidiary corporation is merely an instrumentality, agent, conduit, or adjunct of the parent corporation, *Stigall v. Wickes Mach.*, 801 S.W.2d 507, 511 (Tenn. 1990). In sum, the presumption of corporate separateness may be overcome by demonstrating that the parent corporation "exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own." *Cont'l Bankers Life Ins. Co. of the S.*, 578 S.W.2d at 632.

---

[42] Again, because we conclude that Aurora Cares is directly liable, we need not address whether a joint venture is applicable to that entity.

*Gordon*, 300 S.W.3d at 653. Although *Gordon* involves disregarding corporate separateness in the context of a challenge to personal jurisdiction, other Tennessee courts have applied this test to efforts to pierce the corporate veil to hold a parent company liable for the actions or debts of its subsidiary. *See Elec. Power Bd.,* 691 S.W.2d at 522 (involving the liability of one entity for the tort committed by another related entity); *Cont'l Bankers*, 578 S.W.2d at 637 (involving liability on a debt); *Rodell*, 42 S.W.3d at 866 (describing the alter ego theory as one that "permits a court to disregard a corporate entity in order to impose liability against a related entity, such as a parent corporation or a controlling shareholder, where the two entities are in fact identical or indistinguishable and where necessary to accomplish justice"); *see also **Pamperin v. Streamline Mfg., Inc.***, 276 S.W.3d 428 (Tenn. Ct. App. 2008) (citing the above test in an effort to hold a corporate shareholder liable for the damages sustained due to an injury caused by the corporation); ***Tennessee Racquetball Inv'rs, Ltd. v. Bell***, 709 S.W.2d 617, 624 (Tenn. Ct. App. 1986) (citing the above test in an action to hold a corporate director personally liable for a corporate debt). Thus, the test articulated in *Gordon* is often used to determine whether a parent is the alter ego of its subsidiary and has been summarized as follows:

> When a subsidiary corporation is used as a mere instrumentality of a parent corporation, our Supreme Court has held that the corporate veil of the subsidiary may be pierced to reach the parent if three elements are present:
>
> (1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.
> (2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Pamperin*, 276 S.W.3d at 437–38 (citing ***Cont'l Bankers***, 578 S.W.2d at 632). We will refer to this test as the ***Continental Bankers*** test.

Here, Plaintiff clearly seeks to pierce Allenbrooke's corporate veil to reach parent companies DTD and D&N. As such, the parties expressly agreed to the following jury instruction, largely taken from the Tennessee Pattern Jury Instructions, relevant to this issue:

A limited liability company has a separate and distinct existence from its members and its managers. Members and managers of an LLC are not ordinarily responsible for the debts or liabilities of the LLC. Under certain circumstances, however, you may disregard the separate existence of an LLC if you find that the LLC is a sham or dummy and a mere instrumentality of the members and/or managers. The members and/or managers are legally responsible for the debts or liabilities of the LLC if you find that the plaintiff has carried the burden of proving each of the following three elements: (1) at the time of the transaction, the members and/or managers dominated and controlled both the LLC's finances and its policy and business practices relating to the transaction so that the LLC had no separate mind, will, or existence of its own; and (2) control was actually used to commit fraud or deceit, or to violate a statutory or other positive legal duty, or to commit a dishonest or unjust act in violation of the plaintiff's rights; and the control by the members and/or managers and the wrongful use of that control combined together to be a proximate or direct cause of injury.

*See also* 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 12.15 (2017 ed.) (involving a substantially similar pattern jury instruction where language specific to corporations replaces language specific to limited liability companies). Clearly, the jury instruction agreed to by the parties tracks the above test for piercing the corporate veil as between a parent and subsidiary, i.e., the ***Continental Bankers*** test.

On appeal, however, Plaintiff seeks to rely on a different test, as outlined by the Tennessee Supreme Court in ***Rogers v. Louisville Land Co.***, 367 S.W.3d 196 (Tenn. 2012). Therein, the Tennessee Supreme Court discussed the applicable law wherein a party seeks to pierce the corporate veil so as to find the corporation's shareholder individually liable for the corporation's liabilities:

Ordinarily, a shareholder of a corporation is not personally liable for the acts of the corporation. *See **Oceanics Sch., Inc. v. Barbour***, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003) ("A corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors.") (citing ***Schlater v. Haynie***, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). In appropriate circumstances, however, the corporate veil may be pierced and the acts of a corporation attributed to a shareholder. ***CAO Holdings, Inc. v. Trost***, 333 S.W.3d 73, 88 (Tenn. 2010). "The corporate entity generally is disregarded where it is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." 18 Am.Jur.2d *Corporations* § 57 (2004) (footnotes omitted).

*Id.* at 214–15. While tracking the general law outlined above in the parent-subsidiary context, the Tennessee Supreme Court outlined a completely different test to be used where the corporate veil is pierced to reach a corporate shareholder:

> When determining whether the corporate veil should be pierced, the following factors are applicable:
>
> > Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.
>
> *Trost*, 333 S.W.3d at 88 n.13 (quoting *FDIC v. Allen*, 584 F.Supp. 386, 397 (E.D. Tenn. 1984)). No single factor among those listed is conclusive, nor is it required that all of these factors support piercing the corporate veil; typically, courts will rely on a combination of the factors in deciding the issue. *Barbour*, 112 S.W.3d at 140. However, in all events, the equities must "substantially favor" the party requesting relief, *Trost*, 333 S.W.3d at 89, and the presumption of the corporation's separate identity should be set aside only "with great caution and not precipitately." *Schlater*, 833 S.W.2d at 925.

*Rogers*, 367 S.W.3d at 215 (involving an effort to hold a corporate shareholder personally liable). The Tennessee Supreme Court, like other courts, referred to this multi-part inquiry as "the *Allen* factors." *Id.* at 216. Thus, the multi-factor test articulated in *Rogers* is largely distinct from the test articulated in *Continental Bankers*. As evidenced by the Tennessee Supreme Court's continued citation of the *Continental Bankers* test in *Gordon*, however, the Tennessee Supreme Court has never expressly held that the

*Continental Bankers* test is no longer good law.[43] This situation has left this Court to opine that the *Continental Bankers* test remains viable when piercing the corporate veil as between a parent and subsidiary, while the *Allen* factors are the proper consideration when seeking to hold a shareholder personally liable. *See F & M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc.*, No. E2015-00266-COA-R3-CV, 2015 WL 6122872, at *4 (Tenn. Ct. App. Oct. 19, 2015) (holding that the *Allen* factors are the proper test to apply to an effort to hold a corporation's sole shareholder liable for a debt);[44] *see also Edmunds*, 403 S.W.3d at 830 (citing *Tennessee Racquetball*, 709 S.W.2d at 622 (holding that the *Continental Bankers* test was not applicable to shareholder liability); *Schlater*, 833 S.W.2d at 925 (stating that *Continental Bankers* addressed parent/subsidiary relationships and was therefore inapplicable to the case before it involving a corporation/shareholder relationship)) (noting the disagreement as to whether the *Continental Bankers* test applied in the situation of seeking to hold a sole shareholder liable for the debts of the corporation but ultimately holding that the plaintiff could not prevail under either theory).

Here, arguably, Plaintiff seeks to recover on both theories: (1) to hold parent limited liability companies DTD and D&N liable for the damages caused by subsidiaries Allenbrooke and Aurora Cares' negligence; and (2) to pierce the corporate veil to hold Mr. Denz and Mr. Bennett liable for the torts of the companies of which they are members and/or officers.[45] In this case, however, Plaintiff chose not to proceed under the *Rogers* piercing the corporate veil theory at trial and the *Allen* factors were never presented to the jury. As such, we conclude that any consideration of the *Allen* factors to sustain the jury's verdict has been waived on appeal.

As an initial matter, we note that Plaintiff did not expressly raise "piercing the corporate veil" in its complaint in this matter; rather the theory of vicarious liability alleged in the complaint was only "alter ego."[46] The *Rogers* court, however, did not

---

[43] For example, we cited the *Continental Bankers* test, along with the *Allen* factors in *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 830 (Tenn. Ct. App. 2012), *perm. app. denied* (Tenn. May 9, 2013). The Tennessee Supreme Court, however, chose not to accept permission to appeal in that case in order to clarify the continuing applicability of the *Continental Bankers* test.

[44] The cited decision in *F&M Marketing* was not appealed to the Tennessee Supreme Court. Following remand to the trial court to apply the appropriate standard and make findings of facts and conclusions of law, the trial court declined to pierce the corporate veil. This Court affirmed the decision of the trial court, again applying the *Allen* factors. *See F&M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc.*, 523 S.W.3d 663 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. May 18, 2017).

[45] We note, however, that Mr. Benz and Mr. Bennett are not shareholders of Allenbrooke or Aurora Cares, the entities that participated in the negligence found by the jury; rather their ownership interests in the tortfeasor entities are shielded by an additional layer of limited liability companies. *See e.g., Rogers*, 367 S.W.3d at 215 (involving the liability of a corporation's shareholder); *Edmunds*, 403 S.W.3d at 830 (same); *Schlater*, 833 S.W.2d at 926 (same).

[46] In addition, of course, to theories of agency and joint venture, discussed *supra*.

characterize its analysis as an alter ego test. Rather, that term is associated with the ***Continental Bankers*** test. Still, the parties both discussed the ***Allen*** factors and their application to the facts of this case during the summary judgment phase of this action. Plaintiff's inability to rely on this theory therefore stems not from the pre-trial proceedings, but from Plaintiff's decision during trial, particularly with regard to the jury instructions.

The parties engaged in extensive discussions regarding the jury instructions. Ultimately, however, the parties agreed to charge the jury with the above instruction, consistent with the ***Continental Bankers*** test. No instructions were provided regarding the ***Allen*** factors, despite the fact that these factors are discussed in the comments to the pattern jury instruction from which the subject instruction was taken. As previously discussed, this Court may grant a new trial based upon an erroneous jury instruction even if no objection is made at trial. ***Waters v. Coker***, 229 S.W.3d 682, 689 (Tenn. 2007) (noting that the issue must, however, be raised in the motion for new trial). Setting aside the fact that Plaintiff does not in any way raise the issue of erroneous jury instructions in this appeal, we note that there are several exceptions to this rule.

First, this Court held that the rule excusing a party from objecting to a jury instruction applies only in the event of an erroneous instruction: "it does not relieve a party of the responsibility to bring the trial court's attention to material omissions in the instructions." ***Grandstaff v. Hawks***, 36 S.W.3d 482, 489 n.9 (Tenn. Ct. App. 2000) (citing ***Rule v. Empire Gas Corp.***, 563 S.W.2d 551, 553 (Tenn. 1978) ("[W]e find nothing in the rule which relieves trial counsel of the burden of requesting an instruction to cover alleged omissions in the instructions as given."); *see also* ***State v. Young***, 196 S.W.3d 85, 128–29 (Tenn. 2006) (citing ***State v. Haynes***, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986) ("[M]ere meagerness of an instruction does not constitute reversible error in the absence of a special request for an additional instruction."). This rule applies when the multiple jury instructions are required "in respect to possible theories of recovery or defense[.]" ***McCandless v. Oak Constructors, Inc.***, 546 S.W.2d 592, 599 (Tenn. Ct. App. 1976) ("[I]f appellants deemed the charge to be deficient in respect to possible theories of recovery or defense, it was their privilege and duty to specially request appropriate additions to the charge. Not having done so, they may not complain of the omission on appeal."). Here, the ***Continental Bankers*** instruction was clearly applicable in this case to Plaintiff's efforts to pierce the corporate veil to reach DTD and D&N. As such, any omission of the ***Allen*** factors from the jury charge was required to be made by Plaintiff at the time of the charge. In failing to call the trial court's attention to the omission of the ***Allen*** factors, Plaintiff has waived any consideration of this theory. *See* ***Creech v. Addington***, 281 S.W.3d 363, 386 (Tenn. 2009) (holding that in knowingly acquiescing to a jury instruction involving only a single theory of the case, the plaintiff waived "any claim" under a different theory of liability).

Additionally, we conclude that Plaintiff invited any purported error regarding the omission of the *Allen* factors. "It has long been settled in Tennessee that a party cannot take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." *State v. Garland*, 617 S.W.2d 176, 186 (Tenn. Crim. App. 1981) (applying this rule to an error involving a jury instruction). This Court has previously held that where a party expressly approved a jury charge, the party cannot complain about the charge on appeal. *See Haddock v. Lummus Cotton Gin Co.*, 552 S.W.2d 390, 392 (Tenn. Ct. App. 1976); *see also Roseberry v. Lippner*, 574 S.W.2d 726, 729 (Tenn. 1978), *abrogated on other grounds by McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992) (holding that a party cannot complain on appeal of "invited error"); *Gentry v. Betty Lou Bakeries*, 171 Tenn. 20, 100 S.W.2d 230, 231 (Tenn. 1937) ("This rule of invited error is applied with regard to instructions to the jury."). In a similar case, we have held that a party invited an error regarding a jury instruction when the party expressly agreed to the jury instruction. *See Monypeny v. Kheiv*, No. W2014-00656-COA-R3-CV, 2015 WL 1541333, at *19 (Tenn. Ct. App. Apr. 1, 2015). Here, Plaintiff expressly approved of the jury charge containing only the *Continental Bankers* test. As such, Plaintiff invited any error in failing to request an instruction to the jury that they could also pierce the corporate veil based upon their consideration of the *Allen* factors.

Given that no error may now be predicated on the trial court's jury instructions, we conclude that the *Continental Bankers* test, i.e., the only theory for alter ego/piercing the corporate veil actually submitted to the jury, provides the sole guidepost for determining whether the jury's verdict may be sustained. *See Washington v. 822 Corp.*, 43 S.W.3d 491, 493–94 (Tenn. Ct. App. 2000) (holding that the appellate court cannot sustain a jury's verdict on the basis of a theory about which the jury was never instructed). Indeed, the trial court here specifically instructed the jury that they were "prohibited from considering any other information, and [they should] not to consult any outside sources of information." As such, Plaintiff cannot now rely on the *Rogers* piercing the corporate veil theory to sustain the jury's verdict. *Ellis v. Pauline S. Sprouse Residuary Tr.*, No. E2006-01771-COA-R3-CV, 2007 WL 3121666, at *9 (Tenn. Ct. App. Oct. 26, 2007), *rev'd on other grounds*, 280 S.W.3d 806 (Tenn. 2009) (citing *Washington*, 43 S.W.3d at 493–94 ("The verdict cannot be sustained on the basis of a claim upon which the jury was not instructed.")). Rather, "[t]he general rule that the parties are bound on appeal by the theory followed below . . . applies where it may be fairly said that the trial theory was acquiesced in by the party complaining." 4 C.J.S. *Appeal and Error* § 294 (footnote omitted) (noting exceptions not present here). Thus,

> When a cause is brought up for appellate review, a party cannot assume an attitude inconsistent with, or different from, that taken by him at the trial, and is restricted to the theory on which the cause was prosecuted or defended in the court below. Accordingly, where both parties act on a particular theory of the cause of action, they will not be permitted to depart

- 59 -

therefrom when the case is brought up for appellate review. The same rule governs where the parties act on a particular theory of defense or of opposition thereto.

**Price v. Tennessee Prod. & Chem. Corp.**, 53 Tenn. App. 624, 637, 385 S.W.2d 301, 307 (Tenn. Ct. App. 1964) (citing **Turner v. Zager**, 50 Tenn. App. 674, 363 S.W. (2d) 512); *see also* **Tamco Supply v. Pollard**, 37 S.W.3d 905, 908–09 (Tenn. Ct. App. 2000) ("It is well settled in this state that a party on appeal will not be permitted to depart from the theory on which the case was tried in the lower court.").

Here, Plaintiff chose to rely solely on the **Continental Bankers** alter ego theory in charging the jury. As such, the jury was simply not instructed to consider the **Allen** factors, including the undercapitalization and withdrawals from the business enterprise that Plaintiff now cites on appeal as sufficient evidence to pierce the corporate veil.[47] In the absence of an instruction on the applicability of the **Allen** factors, we cannot assume that the jury relied on this evidence in reaching its verdict. *Cf.* **State v. Harbison**, 539 S.W.3d 149, 163 (Tenn. 2018) (quoting **State v. Knowles**, 470 S.W.3d 416, 426 (Tenn. 2015)) ("We presume that the jury follows all instructions given by the trial court, 'with commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting.'"). As such, we consider the jury's verdict solely through the lens of the **Continental Bankers** test.

We therefore proceed to consider whether the jury had before it sufficient evidence to support a finding that Mr. Denz, Mr. Bennett, DTD, and D&N were the alter egos of the tortfeasors in this case, Allenbrooke and Aurora Cares. As previously discussed the first element of this test requires that Mr. Denz, Mr. Bennett, DTD, and D&N "exercise[d] complete dominion over [Allenbrooke and Aurora Cares], not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own." **Pamperin**, 276 S.W.3d at 437–38 (citing **Cont'l Bankers**, 578 S.W.2d at 632); *see also* **Gordon**, 300 S.W.3d at 653 n.14 (quoting **Material Supply Int'l, Inc. v. Sunmatch Indus. Co.**, 62 F.Supp.2d 13, 20 (D.D.C. 1999) (internal quotation marks omitted) (indicating that in order to disregard corporate separateness under either the agency or alter ego theory, the question that must be answered is "whether the parent corporation 'so dominated the [subsidiary] corporation as to negate its separate

---

[47] Moreover, in support of this evidence, we note that the only citation to the record provided by Plaintiff is (1) the trial court's order on punitive damages, which itself appears to reference a cost report buried in hundreds of pages of exhibits but that was not actually discussed during the compensatory damages phase of trial; and (2) testimony that was presented during the punitive damages phase of trial. As previously discussed, the jury did not have the benefit of the punitive damages testimony when it made the decision regarding the liability of the non-Allenbrooke Defendants. As such, we cannot consider this evidence. *See* **King v. State**, 992 S.W.2d 946, 950 (Tenn. 1999) (holding that in considering the jury's verdict, the appellate court must consider "the evidence actually presented to the jury").

personality'"). In analyzing this issue, we look not merely to the documents outlining the legal relationships between the individuals and entities at issue, but also "their 'economic realities.'" ***Bracken v. Earl***, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000) ("The Courts have repeatedly held that such a 'sham' requires the court to look not only at the organizational documents and surface transactions of the entities involved, but also at their 'economic realities.'").

Plaintiff cites no facts in the argument section of her brief to meet the ***Continental Bankers*** standard.[48] Our review of the record reveals no material evidence to support the first factor in this test. Here, the evidence in the record shows that Mr. Denz, Mr. Bennett, DTD, and D&N did not exercise complete dominion and control over Allenbrooke or Aurora Cares, the entities that committed the torts alleged in this case. Allenbrooke is a skilled nursing facility operating in Tennessee that cares for approximately 180 residents and has over 200 employees. Administrator Meadows testified that Allenbrooke, particularly its duly licensed administrator and director of nursing, rather than any other person or entity, have ultimate authority over admission, care, and staffing at the facility. Indeed, Tennessee law specifically requires that a full-time licensed administrator shall have authority to "assure the provision of appropriate fiscal resources and personnel required to meet the needs of the residents." Tenn. Comp. R. & Regs. 1200-08-06-.04(a). There was simply no evidence that rather than follow Tennessee law, Allenbrooke chose to vest complete authority over operations in its out-of-state investors and that these investors actually exercised complete control over Allenbrooke. The same is true of Aurora Cares. While Mr. Benz and Mr. Bennett were undisputedly involved in this business, there is simply no evidence to meet Plaintiff's burden to show that Mr. Denz, Mr. Bennett, DTD, and D&N completely dominated Aurora Cares, a company providing services to more than thirty nursing homes across the country, so as to impose vicarious liability. As such, Plaintiff did not meet her burden to show that Allenbrooke and Aurora Cares had no separate personality from Mr. Denz, Mr. Bennett, DTD, and D&N for purposes of either an agency or alter ego theory. *See **Gordon***, 300 S.W.3d at 653 n.14.

In particular, we note that the testimony was undisputed that despite multiple audits performed by independent accountants involving the companies at issue in this

---

[48] Indeed, Plaintiff chooses not to explicitly apply the ***Allen*** factors to the facts of this case. Instead, Plaintiff merely argues that "[i]t all depends on the particular facts and circumstances of the case," with no specificity as to the particular facts and circumstances in this case that justify piercing the corporate veil under any theory. *See generally* Tenn. R. Ct. App. 6(a)(4) (requiring that the "argument" in appellate briefs contain "[a] statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found"), (b) ("No complaint or reliance upon action by the trial court will be considered on appeal unless the *argument* contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the *argument* contains a reference to the page or pages of the record where evidence of such fact is recorded.") (emphasis added). Earlier in her brief, however, Plaintiff did discuss some facts that purportedly support "two relevant factors in 'protecting' the corporate form" without any citation to specific authority. These facts are discussed *supra.*

case, all audits resulted in only "clean opinion[s]." Likewise, there was no evidence that either Allenbrooke or Aurora Cares share an address with either the individual defendants or the other limited liability corporations at issue; indeed, Allenbrooke operates its facility in Tennessee, while Mr. Denz, Mr. Bennett, DTD, D&N, and Aurora Cares are all domiciled in New York. *See* **Elec. Power Bd.**, 691 S.W.2d at 525 (considering the fact that the two companies shared an address, but not a telephone number); **Neese v. Fireman's Fund Ins. Co.**, 53 Tenn. App. 710, 714, 386 S.W.2d 918, 920 (Tenn. Ct. App. 1964) (noting that the trial court considered that the two companies shared an address in determining that they were "indistinguishable in fact"). Thus, evidence shows that both Allenbrooke and Aurora Cares had a "separate" existence from their investors/officers and parent companies. *See* **id.**

Moreover, with regard to Tennessee limited liability companies such as Allenbrooke, the fact that corporate formalities were not complied with cannot constitute support for imposing vicarious liability. *See* Tenn. Code Ann. 48-217-101(e) ("The failure of an LLC to observe the usual company formalities or requirements relating to the exercise of its LLC powers or management of its business is not a ground for imposing personal liability on the members, governors, managers, employees or other agents of the LLC."). In other cases where we have held that a person or entity completely dominated the tortfeasor, the evidence essentially showed that the company had no separate existence from the parent company or shareholder. *See, e.g.,* **Edmunds**, 403 S.W.3d at 830 (holding that the shareholder exercised complete dominion over the company where he admitted that the company "was 'essentially' him"). While it may be undisputed that Mr. Denz and Mr. Bennett derived income from the interests in the multiple companies at issue here, many of which provided services to each other, we cannot conclude that this evidence is sufficient to impose vicarious liability under the alter ego theory. *See* **Bracken v. Earl**, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000) (focusing on "which person or entity actually controls the earning of the income rather than who ultimately receives it"). To hold that merely deriving income from a company in which a party is an investor or officer is sufficient to impose liability would largely degrade Tennessee's clear policy to shield the investors in limited liability companies from the liabilities of the company. *See* Tenn. Code Ann. 48-217-101(a). Consequently, we must conclude that the jury lacked material evidence to impose vicarious liability on Mr. Denz, Mr. Bennett, DTD, or D&N under either an agency or alter ego theory.

In the absence of material evidence to support a finding of either direct or vicarious liability under any of the theories presented to the jury against Mr. Denz, Mr. Bennett, DTD, or D&N, the verdict against them for negligence, medical malpractice, and violations of the Tennessee Adult Protections Act cannot stand. The jury's verdict in this regard is therefore reversed. We next must consider the effect, if any, of our decision to discharge Mr. Denz, Mr. Bennett, DTD, and D&N of liability on the damages awarded in this case. As previously discussed, the jury awarded Plaintiff $1,906,000.00 in compensatory damages and for a TAPA violation in the amount of $129,000.00. The

compensatory damages were awarded jointly and severally against all Defendants. Additionally, following the second phase of trial, the jury awarded punitive damages to Plaintiff in the following amounts: (1) $2,000,000.00 each against Allenbrooke, Aurora Cares, DTD, and D&N; and (2) $10,000,000.00 each against Mr. Denz and Mr. Bennett.

In early Tennessee cases, it was the law that judgment could not be divided and that "[i]f it is correct against one party, but erroneous as to others, it cannot be affirmed as to him and set aside as to the others." *Lee v. Melson*, 54 Tenn. App. 53, 55, 387 S.W.2d 838, 839 (Tenn. Ct. App. 1964) (quoting *Nashville St. Ry. v. Gore*, 106 Tenn. 390, 61 S.W. 777, 777 (1901)). Tennessee, however, has now long recognized the principal that in granting a dismissal or new trial to one defendant, the verdict against the other defendant not tainted by the error may stand. *Id.* at 840 (citing 143 A.L.R. 7, p. 15). As we explained,

> The guiding principle is fairness to both parties. A verdict tainted with error or confusion ought not to stand. On the other hand, the parties are entitled to only one day in court. Once a party has been accorded a fair trial on the merits, unaffected by errors of law, he is not entitled to another trial merely because another party to the suit has been granted a new trial to reverse an error peculiar to him.

*Id.* at 841(noting that there are qualifications to the rule). *But see **Jones v. Idles***, No. E2001-02833-COA-R9-CV, 2002 WL 1751504, at *3 (Tenn. Ct. App. July 30, 2002), *aff'd*, 114 S.W.3d 911 (Tenn. 2003) (noting that issues of comparative fault, which are not present in this particular case, could complicate this rule). Currently, American Law Report provides an important exception to the above rule:

> The principal qualification of the modern rule, recognized by the courts as early as the inception of the rule itself, requires the grant of a new trial, or the reversal of the judgment, as to all the defendants, if a new trial is granted or the judgment reversed as to one defendant for error committed as to him, where under the circumstances of the case it becomes apparent that the jury would not have rendered the verdict it did if it had anticipated that the final discharge of the liability incorporated therein as against all the defendants would, by future action of the court, be placed solely upon the other defendant, or that it would not have rendered the verdict it did if such defendant had been sued alone instead of in conjunction with the other codefendants, the idea being that, in such case, failure to set aside the verdict and the judgment or to grant a new trial as to all the defendants, including the defendant as to whom no error was committed, would work an injustice upon the latter.

143 A.L.R. 7 (Originally published in 1943). Thus, where we have substantial doubt that the jury would have rendered the verdict at issue in the absence of the now-removed co-defendant, we cannot affirm the jury's verdict, but must remand for a new trial.

Here, the parties had a full and fair hearing regarding the compensatory damages phase of trial. In addition, other than the evidentiary issues raised, Allenbrooke did not assert on appeal that there was no material evidence to support the jury's verdict that its negligence was the cause of Mrs. Pierce's injuries. We have likewise found material evidence to support a finding of direct liability against Aurora Cares. Moreover, as previously noted, the damages awarded in the liability phase of trial are based upon the injuries sustained by Mrs. Pierce, rather than on the specific culpability of the various Defendants. Given the length of this trial and the complexity of the issues involved, we simply cannot conclude that Defendants are entitled to an entirely new trial on the basis of Plaintiff's failure to prove that Mr. Denz, Mr. Bennett, DTD, and D&N are the alter egos of the tortfeasors in this case.

The same is not true, however, of the punitive damages award. Here, the evidence presented at the punitive damages phase of trial largely focused on the culpability of Mr. Denz and Mr. Bennett. Indeed, the bulk of the punitive damages awarded were against the individual defendants. Liability against these individuals as alter egos of the tortfeasors, however, was not properly established. As such, we cannot determine whether the jury would have awarded the same amount of punitive damages against Allenbrooke and Aurora Cares in the absence of the other defendants. *See* 143 A.L.R. 7. Under these circumstances, it is appropriate to vacate the award of punitive damages as to all Defendants and allow the parties a new trial on this issue.[49] As such, all issues related to the amount of punitive damages in this case are pretermitted.

## VI. Compensatory Damages

Defendants next assert that the trial court erred in approving the compensatory damages award in this case, as Defendants contend that it was excessive. Defendants therefore argue that the trial court should have granted a remittitur. The compensatory damages awarded by the jury as to the claims of negligence and medical malpractice were allocated as follows: (1) $32,000.00 for past medical expenses; (2) $510,000 for pain and suffering;[50] (3) $1,500.00 for loss of enjoyment of life;[51] and (4) $1,362,500 for

---

[49] We recognize that our ruling disallowing liability against Mr. Denz, Mr. Bennett, DTD, and D&N may have some effect on the admissibility of certain evidence that was previously admitted during the punitive damages phase of this trial. We express no opinion as to these issues; rather, they may be relitigated, if appropriate, on remand.

[50] "Pain and suffering encompasses the physical and mental discomfort caused by an injury. It includes the 'wide array of mental and emotional responses' that accompany the pain, characterized as suffering ...; such as anguish, distress, fear, humiliation, grief, shame, or worry[.]" *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *22 n.16 (Tenn.

disfigurement.[52] The jury also awarded Plaintiff $129,000.00 for violations of TAPA.[53] In their brief, Defendants do not challenge the award of past medical expenses; as such, we focus solely on the non-economic damages award in this case.

The responsibility for resolving issues related to the assessment of damages is entrusted to the jury. *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419 (Tenn. 2013) (citing Tenn. Const. art. I, § 6). The award of damages is meant to compensate the plaintiff for damage caused by the defendant's wrongful conduct, making the plaintiff whole. *Id.* (citing *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975)). "The plaintiff bears the burden of proving damages to such a degree that, while perhaps not mathematically precise, will allow the jury to make a reasoned assessment of the plaintiff's injury and loss." *Id.* (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999)). A plaintiff is entitled to recover both economic and non-economic damages. *Id.* While economic damages cover losses such a medical expenses and lost wages, "'[n]on-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life.'" *Id.* at 419–20 (quoting *Elliott v. Cobb*, 320 S.W.3d 246, 248 n.1 (Tenn. 2010)).

> The Tennessee Supreme Court has explained these damages as follows:
> Damages for pain and suffering are awarded for the physical and mental suffering that accompany an injury. *Overstreet*, 4 S.W.3d at 715. Damages awarded for loss of enjoyment of life are intended to compensate a plaintiff for the impairment of the ability to enjoy the normal pleasures of living. *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 571–72 (Tenn.2 005). Assigning a compensable, monetary value to non-economic damages can

---

Ct. App. Feb. 24, 2009) (quoting *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694 (Tenn. Ct. App. 1999)).

[51] "Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life. This type of damage relates to daily life activities that are common to most people." *Smartt*, 2009 WL 482475, at *22 n.17 (citing *Overstreet*, 4 S.W.3d 694, 715–16).

[52] With regard to this type of damage, we have explained,

> A permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover. It prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor. Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty, symmetry, or appearance. Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part ..., or to a mental or psychological impairment.

*Smartt*, 2009 WL 482475, at *22 n.18 (citing *Overstreet*, 4 S.W.3d 694, 715–16).

[53] Defendants largely ignore the damages associated with the TAPA violations in this section of their brief. At no point do they argue that the jury lacked material evidence to support the finding of a TAPA violation against Allenbrooke, nor do they specifically assert that the damages awarded for the TAPA violation were excessive. As such, any argument to that effect is waived. *See Sneed*, 301 S.W.3d 615.

- 65 -

be difficult. *See Wolfe*, 177 Tenn. at 688, 152 S.W.2d at 635 (citing *Power Packing Co. v. Borum*, 8 Tenn. App. 162 (1928)). The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred. *See McCullough v. Johnson Freight Lines, Inc.*, 202 Tenn. 596, 606, 308 S.W.2d 387, 392 (1957); *S. Ry. Co. v. Sloan*, 56 Tenn.App. 380, 392, 407 S.W.2d 205, 211 (1965). Thus, a plaintiff is generally not required to prove the monetary value of non-economic damages. *Health Cost Controls*, 239 S.W.3d at 733 (citing 22 Am.Jur.2d *Damages* § 200 (2007)).

*Meals*, 417 S.W.3d at 420. The assessment of non-economic damages is therefore "left to the sound discretion of the trier of fact," *Overstreet*, 4 S.W.3d at 703, with the trial court serving as "an important check" on the jury's discretion by serving as thirteenth juror:

> As thirteenth juror, the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict. *See State v. Moats*, 906 S.W.2d 431, 433 (Tenn. 1995). No verdict is valid unless approved by the trial judge acting as the thirteenth juror. *See id.* at 434; *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996).
> Generally, if the trial judge is not satisfied with the jury's verdict, the judge must set aside the verdict and order a new trial. *Jones v. Idles*, 114 S.W.3d 911, 914–15 (Tenn. 2003). If the trial judge's dissatisfaction, however, is based only upon the jury's award of damages, the trial judge may suggest a remittitur, which, if accepted by the plaintiff, would reduce the award to an amount the judge deems appropriate. *See Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997).

*Meals*, 417 S.W.3d at 420 (citing Tenn. Code Ann. § 20-10-102(a) (allowing for the trial court to suggest a remittitur following a civil jury trial)). Trial courts are encouraged to cure excessive verdicts through remittitur when possible, rather than granting new trials. *Id.* at 421.

Here, Defendants requested both a remittitur and a new trial. The trial court, however, denied both requests and concurred in the judgment of the jury. Defendants assert that the trial court's decision was in error because the jury's verdict, particularly its award of non-economic damages, was not within the range of reasonableness:

> Trial judges may suggest adjustments to a jury's verdict even if the verdict is within the range of reasonableness. *Id.* at 147. The range of reasonableness is determined by establishing the upper and lower limits of

an award of damages that can be supported by material proof. ***Ellis v. White Freightliner Corp.***, 603 S.W.2d 125, 126–27 (Tenn.1980). To determine whether a verdict is within the range of reasonableness, the trial judge must consider the credible proof at trial regarding the nature and extent of the injuries, pain and suffering, economic losses including past and future medical bills, lost wages and loss of earning capacity, age, and life expectancy. *See **Duran v. Hyundai Motor Am., Inc.***, 271 S.W.3d 178, 212 (Tenn. Ct. App. 2008). "When remittitur is the issue in a personal injury ... case, the question is whether the amount of money awarded is excessive, which requires ascertainment of a figure that represents the point at which excessiveness begins." ***Ellis***, 603 S.W.2d at 126. This will establish the upper limit of the range of reasonableness.

***Meals***, 417 S.W.3d at 421.

Where, however, the trial court has approved the jury's verdict in its role as thirteenth jury, the role of this Court is more limited: "The Court of Appeals' authority to suggest a remittitur when the trial court has affirmed the verdict is far more circumscribed than that of the trial court." ***Id.*** at 423 (citing C***offey v. Fayette Tubular Prods.***, 929 S.W.2d 326, 331 & n. 2 (Tenn.1996)). Thus,

Where the trial judge has approved the verdict in its role as thirteenth juror—as the trial court did in this case—the Court of Appeals' review of the verdict and its ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence. ***Poole v. Kroger Co.***, 604 S.W.2d 52, 54 (Tenn. 1980); *see also **Thrailkill***, 879 S.W.2d at 841; ***Ellis***, 603 S.W.2d at 129. Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." ***Knoxville Traction Co. v. Brown***, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905). An appellate court is required to take "the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence." ***Akers v. Prime Succession of Tenn., Inc.***, 387 S.W.3d 495, 501–02 (Tenn. 2012) (quoting ***Barkes v. River Park Hosp., Inc.***, 328 S.W.3d 829, 833 (Tenn. 2010)). The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *See **Ellis***, 603 S.W.2d at 129 ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is any material evidence to support the award, it should not be disturbed." (emphasis added)). "It matters not a whit where the weight or

- 67 -

preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119–20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id.* Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material evidence to support a jury verdict, the appellate courts must affirm it. *See* Tenn. Const. art. I, § 6; *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979) (quoting *D.M. Rose & Co. v. Snyder*, 185 Tenn. 499, 508, 206 S.W.2d 897, 901 (1947)); *Crabtree Masonry Co.*, 575 S.W.2d at 5; *City of Chattanooga v. Ballew*, 49 Tenn.App. 310, 316–17, 354 S.W.2d 806, 808–09 (1961); *see also Grandstaff v. Hawks*, 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000) ("We have a duty to uphold a jury's verdict whenever possible.").

*Meals*, 417 S.W.3d at 422–23.

Defendants cite several cases in support of their assertion that the verdict was outside the range of reasonableness. According to Defendants these cases involve similar facts, but much smaller awards of non-economic damages, illustrating the award at issue is excessive. Although the Tennessee Supreme Court has authorized this Court to compare the verdict at issue with those in similar cases, the court cautioned against too heavy a reliance on this tactic. As the court explained:

> First, we recognize that by reviewing verdicts in published opinions, we are not reviewing the entire pool of damage awards. Cases resolved by settlement and/or mediation are not included in the pool of damage awards, and their absence can skew the results. Second, we must take care to only consider cases that are "similar"—presumably involving a similar plaintiff with similar injuries. Third, courts should take inflation and the reduced value of the dollar into account when considering these verdicts. . . . Finally, courts should be mindful that when looking at other jury verdicts, each case must be judged on its own particular facts.

*Id.* at 426 (citations omitted). Moreover, the court noted that juries have "wide latitude in assessing non-economic damages" and that we should generally "trust jurors" to use their experiences "to value the intangible harms such as pain, suffering, and the inability to engage in normal activities," a task made all the more difficult in catastrophic injury cases. *Id.* at 425. As such, while we must protect against excessive verdicts, we cannot second-guess the jury or substitute our judgment for theirs. *Id.* at 435 (citing *Coffey*, 929 S.W.2d at 330–31 & n.1).

As an initial matter, we first discuss the evidence of Mrs. Pierce's injury and suffering that was presented to the jury. In doing so, we consider only the evidence

presented in favor of the verdict and disregard all countervailing evidence. *See Meals*, 417 S.W.3d at 422. Here, Defendants assert that the time frame at issue involved only a period of two months between Mrs. Pierce's amputation and death. The evidence shows, however, that Allenbrooke's negligence did not begin on the day of Mrs. Pierce's amputation, but many weeks prior thereto. Here, the wound on Mrs. Pierce's foot was first recorded on June 29, 2009, approximately more than three months prior to her death. According to Plaintiff's evidence, the wound occurred because Allenbrooke's employees failed to properly turn Mrs. Pierce following her May 2009 stroke, resulting in the formation of pressure sores, that left improperly treated, ultimately resulted in the amputation of Mrs. Pierce's leg.

The evidence shows that Mrs. Pierce experienced pain and a loss of dignity throughout this time frame. Even before the amputation, Ms. Hatfield testified that Mrs. Pierce was experiencing pain. Likewise, the evidence showed that Mrs. Pierce was not properly changed or bathed, resulting in her often sitting in her own urine and feces. According to Plaintiff's evidence, during this time, Mrs. Pierce was denied proper physical therapy and turning, resulting in muscle contracture in one leg, meaning that the leg was permanently bent. The contracture, which caused Mrs. Pierce's foot to permanently be placed near her torso, coupled with the standing urine and feces, caused the wounds that developed on Mrs. Pierce's foot to become infected. Despite orders that Mrs. Pierce was not to wear shoes and socks due to her wounds, Allenbrooke employees continued to place these items on Mrs. Pierce, likely resulting in additional, unnecessary pain. *See Meals*, 417 S.W.3d at 422–23 (requiring that we give the verdict all reasonable inferences in its favor). Plaintiff also submitted evidence that once the wounds were known to staff, there was delay in implementing proper treatment, including proper nutrition intended to help Mrs. Pierce heal. Likewise, Plaintiff presented evidence that Mrs. Pierce's hydration needs were not met at this time. All the while, Mrs. Pierce's medical records show that she often did not receive prescribed pain medication.

During this time, the wound grew much, much worse. When Mrs. Pierce's son was first shown the wound, he described his mother's foot as looking "like a piece of black charcoal" with a "maximum foul odor." Ms. Hatfield in turn described the smell of her mother's foot as "horrible . . . like death." When Mrs. Pierce was finally transferred to the hospital due to the wound, wound cultures revealed that it was teeming with three different types of microorganisms, at least one of which is associated with contact with human feces. According to a physician, at this point, there was essentially no choice but to amputate, as Mrs. Pierce's foot was "rotted."

Dr. Robbins, Plaintiff's causation expert, testified that Mrs. Pierce's injuries, which he opined were caused by Allenbrooke's total neglect, would have resulted in severe pain for Mrs. Pierce. According to Dr. Robbins, by the time Mrs. Pierce arrived at the hospital, her wound had already "turned black," and become a "soupy infection." Indeed, Mrs. Pierce's wound was characterized by "rot to the bone to the point where it

was just mush." When asked whether these wounds would have caused Mrs. Pierce pain, Dr. Robbins responded, "Oh my goodness, yes. Yes."

The experience of amputation was no better, which Dr. Robbins' described as "absolute horror." Specifically, the procedure involves use of a sagittal saw to saw the bone apart. According to Dr. Robbins, the recovery from this operation "hurts like hell."

Keeping these facts in mind, we turn to consider the cases relied upon by Defendants. In ***Wilson v. Monroe County***, 411 S.W.3d 431 (Tenn. Ct. App. 2013), this Court held that a total award of $150,000.00 in compensatory damages was not insufficient to compensate for the loss of the plaintiff's injury. In ***Wilson***, the plaintiff suffered significant pain following an injury to her foot; the injury ultimately caused the plaintiff's leg to be amputated slightly above the knee, resulting in some loss of mobility. ***Id.*** at 443–44. As an initial matter, we note that the focus of this case—whether the damages are excessive—is not the same as the focus in ***Wilson***, which involved an argument by the plaintiff that the damages were insufficient. ***Id.*** Moreover, ***Wilson*** involved a bench trial. As such, our review was not constrained by the material evidence standard. ***Id.*** at 443 (noting that preponderance of the evidence standard was applicable to the damages decision). Indeed, the Tennessee Supreme Court indicated that when we review other verdicts for purposes of determining the reasonableness of a jury's award of non-economic damages, our review is generally directed toward other *jury* verdicts, not verdicts resulting from bench trials. ***Meals***, 417 S.W.3d at 426 (directing courts to use caution "when looking at other *jury* verdicts") (emphasis added).[54]

The facts are also not entirely analogous. In ***Wilson*** the Court described the plaintiff as only suffering "60 days of pain and suffering and loss of a limb with some loss of mobility." ***Id.*** at 438. In contrast, the evidence here shows that Mrs. Pierce suffered for approximately five months due to Allenbrooke's negligence, both before and after her amputation. Additionally, the ***Wilson*** case did not involve the same loss of dignity that Mrs. Pierce experienced in this case. As such, we cannot conclude that ***Wilson*** is sufficiently analogous to the facts in this case to justify setting aside the jury's verdict in this case.

Likewise, the other cases cited by Defendants have divergent facts or procedural postures that distinguish them from the case-at-bar. For example in ***Oaks v. State***, No. 03-A01-9104BC00129, 1991 WL 260668, at *3 (Tenn. Ct. App. Dec. 12, 1991), the issue on appeal again involved a request by the plaintiff to increase the amount of damages awarded in a bench trial. ***Id.*** at *3. Indeed, Defendant cites no law in which a Tennessee

---

[54] The ***Meals*** court did not consider any Tennessee verdicts that resulted from bench trials. The court did consider, however, some cases from outside our jurisdiction that involved bench trials. ***Meals***, 417 S.W.3d at 426 (citing nine jury cases and two non-jury cases).

court held that a jury's non-economic damage award was excessive under similar circumstances to the case-at-bar.

Plaintiff, however, points to a case that she argues is factually similar to the case-at-bar where this Court upheld substantial non-economic damages to a patient who was injured due to the negligence of a nursing home. In ***Smartt v. NHC Healthcare/McMinnville, LLC***, No. M2007-02026-COA-R3-CV, 2009 WL 482475 (Tenn. Ct. App. Feb. 24, 2009), the jury awarded $3,200,000.00 in non-economic damages, compared to only $81,839.08 for medical expenses for the plaintiff's medical malpractice claim. The jury also awarded the plaintiff $800,000.00 in non-economic damages due to the defendants' negligence, while awarding only $20,459.77 for medical expenses on this claim. ***Id.*** at *25. On appeal, the defendants asserted that the award was excessive based upon the resident's, Mr. Myers's, "age, life expectancy, and pre-existing conditions." ***Id.*** at *22.

After comparing the somewhat similar cases, we largely affirmed the jury's verdict. ***Id.*** at *23–*26. With regard to the damages as a result of loss of enjoyment of life—$700,000.00 for medical malpractice and $275,000.00 for negligence—we concluded that the award was reasonable despite Mr. Myers's advanced age because "he was entitled to enjoy what remained of his life and was entitled to be compensated for the limitations placed upon his ability to do so as a result of the defendants' conduct." ***Id.*** at *24. Because the injuries that the resident suffered, including contracture, pressure sores, and a hip fracture reduced the resident's quality of life, the damages were appropriate. ***Id.***

With regard to the disfigurement damages—$500,000.00 for medical malpractice and $75,000.00 for negligence—we affirmed in part, but reversed in part. With regard to medical malpractice, we affirmed the award, holding that the evidence of pressure sores and contractures was sufficient to sustain the award, particularly where Mr. Myers's pressure sore "devoured the skin, reaching the bone." ***Id.*** The court, however, concluded that the claim for ordinary negligence could not sustain the disfigurement damages. ***Id.***

Finally, we affirmed the pain and suffering damages—$2,000,000.00 for medical malpractice and $450,000.00 for negligence. In reaching this result with regard to the negligence claim, we noted that

> Due to Mr. Myers' physical condition, he was dependent upon the defendants for a number of ordinary tasks, such as bathing, feeding, grooming, and mobility. There is evidence that the defendants' failure to fulfill these obligations resulted in continuous and substantial suffering that Mr. Myers endured during his residency at the Facility. The plaintiffs testified that, during visits, they would find Mr. Myers unshaven, poor smelling, with long, dirty fingernails, living in a room with a foul odor, and

- 71 -

occasionally languishing in his own feces. The defendants' conduct rendered Mr. Myers helpless and deprived him of his dignity.

*Id.* at \*25. In affirming the $2,000,000.00 pain and suffering award for medical malpractice, we noted that the award "may appear to be high," but ultimately concluded that it was not excessive. As we explained:

> The defendants' malpractice during [the resident's] residency caused him to suffer from a number of medical problems, including the contractures, pressure sores, hip fracture, and urinary tract infection. Malpractice was found by the jury and is supported by the record. It is not our function to determine if we would make a different award than that of this jury; rather, we are required to test whether the award is supported by evidence and within the range of reasonableness. *Duran*, 271 S.W.3d at 211. As noted earlier, an award for pain and suffering is not easily quantified and the amount of damages awarded should be left to the sound discretion of the jury to make a subjective determination in reaching an appropriate figure. *Id.* at 210–12. We acknowledge the factors which would weigh against the jury's award, i.e., Mr. Myers' age and pre-existing conditions; however, we do not find these factors to overcome the discretion this Court affords a jury in making a subjective damage award and we do not assume that the jury did not take them into account in making its award. Upon a review of the record, we find that the award is sufficiently supported by evidence and does not exceed the upper limit of reasonableness.

*Smartt*, 2009 WL 482475, \*24.

In the subject case, the jury only awarded one set of compensatory damages as a result of both the negligence and medical malpractice claims.[55] Other than this difference,

---

[55] As previously discussed, the special verdict form ultimately agreed to by the parties in this case specifically directed the jury not to award damages as to medical malpractice if damages for the same injuries were awarded for negligence. Again, we construe the jury's verdict "to give [it] the most favorable interpretation and to give effect to the intention of the jurors if that intention be permissible under the law and ascertainable from the phraseology of the verdict." *Briscoe v. Allison*, 200 Tenn. 115, 125–26, 290 S.W.2d 864, 868 (Tenn. 1956)). Construing the jury's award in the light most favorable to it, we must conclude that in finding Defendants liable under both theories of negligence and medical malpractice but awarding damages only for one of these torts, the jury's award encompasses the damage that resulted to Mrs. Pierce from both the medical malpractice and ordinary negligence. As such, we compare the jury verdict in this case to both of the separate awards in *Smartt*, which encompassed the same torts as found by the jury here. Although Defendants attempt to distinguish *Smartt* from the facts of this case in their reply brief, in no way do they argue that we should not look to the total award in *Smartt* to determine the reasonableness of the jury's award in this case. Indeed, Defendants in their reply brief discuss the disfigurement awarded by the *Smartt* jury under both medical malpractice and negligence, comparing those awards to the award in this case.

however, the similarities between this case and ***Smartt*** are striking. Like in this case, the negligence and medical malpractice occurred while the decedent was a resident at the defendant nursing home. In both cases, the residents were elderly, had low life-expectancies, and many pre-existing conditions. Indeed, both Mr. Myers and Mrs. Pierce died not long after the negligence at issue. The juries in both cases, however, did not find the defendants liable for the deaths of the residents.

The evidence concerning the suffering of each resident and their injuries were also similar. Prior to their deaths, both residents suffered a loss of dignity by being left in their own urine and feces when they became immobile due to an injury. ***Id.*** at *3. Likewise, the period of suffering was similar in both cases. Here, Mrs. Pierce began to suffer following her May 2009 stroke, as this caused immobilization that was not properly addressed by Allenbrooke, until she died in October 2009. In ***Smartt***, the allegations regarding the nursing home's failure to address the resident's immobilization occurred between his February 2005 readmission to the nursing home and his August 2005 death, only approximately two months more than the period at issue here. During this period of immobilization, both patients suffered contracture and pressure sores so extensive that the sores rotted to the bone. Moreover, the negligence in both cases was not limited to a single incident, but resulted from mistreatment that was "continuous and enduring." ***Id.*** at *25.

The cases are not indistinguishable, however. For example, in ***Smartt***, the evidence showed that the defendant facility negligently allowed the resident to fall, resulting in a hip fracture. Prior to this fall, the resident did have some mobility. In contrast, following Mrs. Pierce's May 2009 stroke, her mobility was already severely limited. There was also no allegation that Mrs. Pierce's stroke was the result of negligence by Allenbrooke, unlike the fall in ***Smartt***. Still, we cannot conclude that Mrs. Pierce's poor condition following her stroke meant that she was not "entitled to enjoy what remained of h[er] life and was entitled to be compensated for the limitations placed upon h[er] ability to do so as a result of the defendants' conduct." ***Id.*** at *24. Additionally, the jury in this case awarded very little to represent the loss of Mrs. Pierce's enjoyment of life, apparently taking into account this evidence.

We also note that the award of non-economic damages in ***Smartt*** amounted to approximately forty times the amount of economic damages awarded for both the medical malpractice and negligence claims. ***Id.*** at *2. Here, the non-economic damages awarded to Plaintiff represent approximately fifty-eight times the amount of damages awarded for past medical expenses. The Tennessee Supreme Court has held, however, that awards of non-economic damages are not subject to precise mathematical calculation and that "each case must be judged on its own particular facts." ***Meals***, 417 S.W.3d at 426.

One of the key differences is seen in the disfigurement award, which is far larger than that awarded in **Smartt**.[56] The proof supports this award, however, as the evidence concerning Mrs. Pierce's disfigurement is far stronger. As previously discussed, disfigurement type of compensable injury includes loss of use of a body part. **Overstreet**, 4 S.W.3d at 715 (citing **Rapp v. Kennedy**, 101 Ill.App.2d 82, 242 N.E.2d 11, 13 (Ill. Ct. App. 1968)). In **Smartt**, the resident's disfigurement consisted of pressure sores and contracture. **Smartt**, 2009 WL 482475, *24. Here, Mrs. Pierce's pressure sores and contracture became so badly infected that she was required to undergo a "horrible" amputation procedure of her leg well above the knee. Thus, while the disfigurement award in this case is considerably larger than that awarded in **Smartt**, we conclude that it is supported by material evidence and reasonable.

Moreover, despite similar timeframes and injuries, the jury chose to award Plaintiff much less overall in terms of pain and suffering in this case, $510,000.00 compared to well over $2,000,000.00 in **Smartt** relative to the medical malpractice claim. The award in **Smartt** therefore provides "the upper limit of the range of reasonableness" in this case. **Meals**, 417 S.W.3d at 421. Even including the damages awarded for violations of TAPA, which were not at issue in **Smartt**, the jury here awarded Plaintiff approximately half the total non-economic damages awarded in **Smartt.** Indeed, the total non-economic damages awarded in this case are approximately one million dollars less than just the medical malpractice non-economic damages in **Smartt**.

In total, the jury exercised its sound discretion to award Plaintiff $1,874,000.00 in non-economic damages caused by negligence and medical malpractice. After carefully reviewing the evidence in the light most favorable to Plaintiff, assuming the truth of all the evidence in support thereof, taking all reasonable inferences in the verdict's favor and discarding any inferences to the contrary, and considering verdicts in similar cases, we conclude that this verdict was supported by material evidence and is within the range of reasonableness. The award of compensatory damages is therefore affirmed.[57]

---

[56]As noted above, the Court in **Smartt** vacated the disfigurement damages that were awarded as a result of negligence, holding that there was no evidence that Mr. Myers suffered disfigurement as a result of ordinary negligence. **Smartt**, 2009 WL 482475, at *25. Nowhere in Defendants' initial brief did they assert that the disfigurement award here should likewise be vacated because it was awarded as part of the damages for negligence. As such, any argument to that effect is waived. *See* **Sneed**, 301 S.W.3d 615. Again, we construe the damages awarded in this case as encompassing both the torts of negligence and medical malpractice.

[57] Based on this decision, we discern no error in the trial court's denial of a remittitur in this case. *See* **Borne v. Celadon Trucking Servs., Inc.**, 532 S.W.3d 274, 306 (Tenn. 2017) (quoting **Ellis v. White Freightliner Corp.**, 603 S.W.2d 125, 126 (Tenn. 1980)) ("The appellate court may suggest remittitur only if it finds that the award exceeds the uppermost boundary of the range of reasonableness under the evidence presented, i.e., 'the amount beyond which there is no evidence, upon any reasonable view of the case, to support the verdict.'").

## VII. Punitive Damages

Although our decision to reverse the finding of direct and vicarious liability required that we vacate the amount of punitive damages awarded in this case, the jury made the determination to award punitive damages during the first phase of the bifurcated trial in this case. As such, we will review that issue in this appeal. Specifically, Defendants assert that there was no basis to award punitive damages in this case, as Defendants contend there was no testimony of any reckless, malicious, fraudulent, or intentional acts by Allenbrooke or Aurora Cares that would rise to the level of punitive damages. In their brief, Defendants largely focus on the lack of evidence that Aurora Cares, Mr. Denz, Mr. Bennett, DTD, or D&N were directly involved in Mrs. Pierce's care. We have thoroughly discussed this issue and need not repeat our analysis here. Instead, we consider whether there was sufficient evidence of egregious conduct to sustain the jury's verdict against Allenbrooke, who undisputedly provided the care in this case, and Aurora Cares, who may also be directly liable based on the above analysis.[58]

According to the Tennessee Supreme Court, punitive damages may be awarded only where the court finds that "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). A person acts recklessly when "the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Id.* at 901. "[B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Id.* A jury's finding of sufficient conduct to support punitive damages is reviewed on appeal, however, under the limited material evidence standard. *See also Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 532 (Tenn. 2008) (holding that even where the burden of persuasion at trial is clear and convincing evidence, as in the case of the award of punitive damages, we utilize the material evidence standard to review the jury's verdict and do not reweigh the evidence). *But cf. Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 190 (Tenn. 2009) ("When deciding whether a punitive damages award

---

[58] We note that Defendants also contend that the trial court's order affirming the punitive damages award was insufficient. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 902 (Tenn. 1992) ("After a jury has made an award of punitive damages, the trial judge shall review the award, giving consideration to all matters on which the jury is required to be instructed. The judge shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed."). The *Hodges* review is required only following the jury's award of punitive damages in the second phase of trial. Additionally, Defendants chose to address this issue in their brief following their assertion that there was no basis to award punitive damages. Because we have determined that a new trial on the amount of punitive damages is warranted, a new order by the trial court must be entered. As such, we conclude that this issue is pretermitted along with the other issues addressed to the amount of punitive damages.

is excessive to the point that it transgresses constitutional due process standards, our review is de novo to ensure that the award is based on an application of the law rather than the jury's caprice.").

As previously discussed, Plaintiff presented material evidence that Allenbrooke breached its duty of care to Mrs. Pierce, by failing to adequately bathe and change her, resulting in her often found by family and staff in her own urine and feces. Likewise, Plaintiff's evidence showed that this failure to keep Mrs. Pierce clean and dry, coupled with a failure to timely turn her, resulted in a pressure sore on Mrs. Pierce's foot, which then became infected to the point where her bone turned "soupy," requiring amputation above the knee. Plaintiff also presented material evidence, in the form of testimony and training videos, that Allenbrooke and its employees were well aware of the risks associated with failing to bathe, change, and turn immobilized nursing home patients and that Mrs. Pierce's wound was one of the risks associated with that failure. Additionally, former employees testified that Allenbrooke was repeatedly informed that understaffing was an issue in the facility and that the understaffing was causing care issues. This Court has previously held that similar knowledge of understaffing in a nursing home was sufficient to support an award of punitive damages. *See **Smartt***, 2009 WL 482475, at *27. Finally, Plaintiff presented the testimony of Dr. Robbins, who opined that Mrs. Pierce's injuries could have resulted only in an environment of "total neglect." Indeed, Dr. Robbins described Mrs. Pierce's treatment as both "virtually a willful lack of care" and an "outrageous lack of care."

Thus, the jury had material evidence to conclude that Allenbrooke consciously disregarded a substantial and unjustifiable risk and that their disregard constituted a gross deviation from the standard of care. We therefore do not disturb the jury's finding that punitive damages are warranted based upon the facts of this case. Because the jury had material evidence in which to conclude that Aurora Cares was involved in the staffing and care at Allenbrooke, as discussed *supra*, they may also be subject to punitive damages in this case. *See **Bestfoods***, 524 U.S. at 72.  As previously discussed, however, the amount of punitive damages awarded is inextricably linked with the liability of Mr. Denz, Mr. Bennett, DTD, and D&N. Accordingly, we vacate the amount of punitive damages and remand to the trial court for a new hearing solely as to the amount of punitive damages that may be awarded in this case as to both Allenbrooke and Aurora Cares.

### VIII.  Motion for New Trial in the Interests of Justice

Finally, Defendants contend that "[j]ustice demands that the judgment against all Defendants be reversed" due to the numerous alleged errors committed by the trial court in this cause. We have thoroughly analyzed the record and the argument of the parties. Although the jury lacked material evidence to impose liability against Mr. Denz, Mr. Bennett, DTD, and D&N, Defendants have failed to meet their burden to show, through

proper briefing, any other prejudicial errors in this case that would necessitate a new trial as to all the issues presented. Additionally, we find no merit in Defendants' contention that they were "'condemned to suffer grievous loss' without 'the opportunity to be heard . . . in a meaningful manner.'" *See Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976). In this case, Defendants litigated this case for approximately eight years, including a five-week jury trial. Again, the record created by this case spans twenty-two banker's boxes. There is absolutely no merit to Defendants' assertion that they were not given sufficient opportunity to be heard in this case. As such, we decline Defendants' invitation to award a new trial on the basis of a purported lack of justice.

## Conclusion

The judgment of the Shelby County Circuit Court is affirmed in part, reversed in part, vacated in part, and remanded for a new hearing on the amount of punitive damages to be awarded in this case. Costs of this appeal are taxed to Appellants, and their surety, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE